PREFERRED RISK MUTUAL INSUR-
ANCE COMPANY, Plaintiff,

v.

Samuel A. POOLE et al., Defendants.

No. EC 74–168–K.

United States District Court,
N. D. Mississippi, E. D.

March 12, 1976.

Wade H. Lagrone, Tupelo, Miss., for plaintiff.

John R. Young, Corinth, Miss., for Poole.

David L. Coleman, Corinth, Miss., for Morris and Gattis heirs.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is a diversity action in which Preferred Risk Mutual Insurance Company (Preferred Risk) seeks declaratory relief respecting its rights and liabilities under an automobile insurance policy it issued to Samuel A. Poole. Joined as defendants in the action, in addition to the named insured, are George William Cutshall, administrator of the estate of Vernon Jerome Lovelace, and the heirs at law and death beneficiaries of J. D. Morris and Ben McRae Gattis. The complaint alleges that on December 1, 1972, while its policy was in force, an accident occurred involving the insured vehicle, a 1972 Chevrolet pickup truck, in which Lovelace the driver, and Morris and Gattis, passengers, all sustained fatal injuries alleging that death actions by Morris' and Gattis' heirs had been instituted in the Circuit Court of Tishomingo County, Mississippi, against Lovelace's administrator, Preferred Risk sought to determine whether its policy covered the two death claims, and if it was under a duty to defend the state court suits. All defendants other than Poole have answered, denying that the policy provisions exclude coverage to Lovelace's estate.

After certain facts were stipulated, followed by an evidentiary hearing and other proceedings, the court finds the facts as follows:

## I. FINDINGS OF FACT

Poole, the named insured, was a stonemason contractor who regularly employed Lovelace, Gattis and Morris in the ordinary conduct of his business. Lovelace and Gattis were each stonemasons paid by the square foot; Morris, their helper, was hired as an hourly worker. Lovelace, Gattis and Morris were neighbors, residing in or near the community of Belmont, Mississippi. In the regular course of business, Poole contracted for jobs some distance from Belmont and it became necessary to transport his work crew to the job sites. During November and December 1972 jobs were in progress at Dixon, Tennessee, and also at Nashville. Lovelace, who was Poole's son-in-law, customarily drove Poole's truck from the Belmont community to these job sites, thus providing transportation for his co-employees, Gattis and Morris. The three men would habitually leave home for work on Monday morning, remain away all week and return to Belmont on Friday. Poole paid all transportation expenses. It was, of course, essential for all three men to be trans-

ported weekly in this manner to perform their tasks at the Dixon job.

In November 1972 Poole, who often worked with his crew, was hospitalized because of injury. Thus, the active management of his business passed to his daughter, Ann, the wife of Lovelace. At her father's request, Ann Lovelace instructed the men, when leaving the Dixon job site upon completion of the work week ending on Friday, December 1, to go to Bokar Enterprises at Nashville and pick up a check for Poole. The trip to Nashville was made, but for some reason the three men failed to pick up the check at Bokar Enterprises and were proceeding south on Interstate 65 when the accident occurred at approximately 6:15 p. m. The Dixon job site was located approximately 40 miles west of Nashville, and the usual, customary and most convenient route of travel between Belmont and Dixon was by way of Interstate 65, south of Nashville. As the three men were enroute to their homes in Belmont, Lovelace, who was driving, failed to keep the truck on the highway, allowing it to plunge into a ditch and producing instantaneous death for all. Although the evidence fails to show the precise time that Lovelace and his co-workers left the Dixon job, the reasonable inference is that the men had control over their hours of work and there was no definite quitting time. As noted, Lovelace and Gattis as stonemasons were compensated on the basis of their production. Lovelace not only had express permission from Poole to use the truck, he was in direct charge of the three-man crew.

The journey of the trio to Nashville was pursuant to their employer's explicit instructions, and that, of course, did not constitute a turning aside from their employment. Hence, at the moment of the accident and their resulting deaths, the men were returning home at the close of the work week in a vehicle provided by their common employer for that purpose. There is no basis for inferring that any of them had deviated from their employment. Although it appears that all three occupants had been drinking alcoholic beverages, this fact, alone, would not amount to deviation from their employment duties. It is as likely that the men, working outdoors in cold weather, consumed some alcoholic beverages while on the Dixon job as that they began drinking after leaving the job site.

■ The court therefore finds from this evidence that Lovelace and his co-workers did not deviate from the course of their employment, that their journey to Nashville was in line with express instructions from their employer and did not of itself constitute a turning aside from the course of employment. Absent contrary evidence, the men must be found to have been acting within the scope of their employment at the time of the fatal accident.

■ This conclusion is one not only of fact but of law, and flows from the well-settled proposition that where an employer provides a job site distantly removed from his place of business, and furnishes transportation for these employees to and from that job site, then travel to and from the job is an incident of employment, and the employees are, during such travel, acting in the course of their employment. This is especially true where, as here, promotion of the employer's business requires use of the employer's vehicle and transportation of the employees and their work equipment to and from the job site. See 57 C.J.S. Master and Servant § 570(4); 60A C.J.S. Motor Vehicles § 437(2), (3); 8 Am. Jur.2d, Automobiles and Highway Traffic § 630; *Tullier v. Capitol Construction Co.*, 190 So.2d 880 (Miss.1966); *Brown v. Bond*, 190 Miss. 774, 1 So.2d 794 (1941); *Caver v. Eggerton*, 157 Miss. 88, 127 So. 727 (1930).

## II. CONCLUSIONS OF LAW

■ Our task is to determine whether, under these facts, Preferred Risk's policy, issued to Poole, covers the wrongful death claims brought in state court against Lovelace's administrator by the Morris and Gattis heirs, and whether

Preferred Risk has a duty to defend those actions. This point must be decided upon the basis of three provisions contained in the policy and two Mississippi statutes. We consider first possible exclusion from coverage afforded by the policy, before addressing the effect of Mississippi's applicable statutory law.[1]

(a) *The Cross-Employee Exclusion.*

The first asserted exclusion from coverage contained in the policy is known as the "cross-employee" exclusion:

"The insurance with respect to any person or organization other than the named insured or such spouse does not apply: . . . . .
(2) to an employee with respect to injury or sickness, disease or death of another employee of the same employer injured in the course of business employment in an occurrence arising out of the maintenance or use of the automobile in the possession of such employer."

As to the efficacy of this exclusionary clause, there can be no serious controversy, for even the defendants acknowledge Mississippi's recognition of the validity of the cross-employee exclusion and its required applicability to the facts as found by the court. Lovelace, as driver of the insured vehicle and the person for whom coverage is urged by defendants, is not the named insured but, like Gattis and Morris, is an employee of the named insured, Poole. Moreover, as we have indicated in our findings of fact, the injuries to and resulting deaths of Gattis and Morris took place "in the course of business employment in an occurrence arising out of the maintenance or use of the automobile in the possession of such employer [Poole]."

Thus, the cross-employee exclusion is directly applicable and, if considered alone, would relieve Preferred Risk of any duty of coverage; indeed, in light of *Travelers Insurance v. State Farm Mutual*, 175 F.Supp. 673, aff'd 274 F.2d 208 (5 Cir. 1959), and *Stewart v. Liberty Mutual Ins. Co.*, 256 F.2d 444 (5 Cir. 1958), no other result would be legally defensible.

(b) *The Employee Exclusion.*

Exclusion from coverage is also urged on the basis of another policy provision, one known generally as the "employee exclusion" clause, which in this case provides:

"This policy does not apply:

. . . . .

(e) under coverage A to bodily injury to or sickness, disease or death of any employee of the insured arising out of and in the course of (1) domestic employment by the insured as a benefit therefor or in whole or in part either payable or authorized to be provided under any workmen's compensation law, or (2) other employment by the insured;"

Although treatment of the quoted employee exclusion clause by American courts has been far from uniform,[2] the Supreme Court of Mississippi, whose position we are *Erie*-bound to follow, has held that where the injured party is an employee of *any* person insured under the policy, the employee exclusion clause defeats coverage, even though such injured employee was not employed by the person seeking coverage under the policy. *Benton v. Canal Ins. Co.*, 241 Miss. 493, 130 So.2d 840 (1961); *Continental Casualty Co. v. Pierce*, 170 Miss. 67, 154 So. 279 (1934). There can be no doubt

---

1. As the parties acknowledge and the court agrees, Mississippi's substantive law must govern interpretation of this policy, which was issued in Mississippi to a Mississippi insured, covering employees who were Mississippi residents. That the fatal accident occurred on a Tennessee highway is not, alone, of such legal significance as to require application of the substantive law of Tennessee. Clearly, the

"center of gravity" of this action was located in Mississippi, and, by settled principles of Mississippi conflict of law rules, Mississippi substantive law must be applied. See *Mitchell v. Craft*, 211 So.2d 509 (Miss.1968).

2. See, e. g., 50 A.L.R.2d 78; *General Ins. Co. of North America v. Reid*, 216 So.2d 41 (Fla. App.1968).

that the Mississippi Supreme Court, if presented with this case, would hold that since Gattis and Morris were employees of Poole, the named insured, and since the death-producing accident occurred in the course of their employment, the employee exclusion clause would also bar Lovelace's administrator from coverage.

(c) *Uninsured Motorist Endorsement.*

A distinctive issue, however, emerges from the presence of an uninsured motorist endorsement on Preferred Risk's policy. That clause obligates Preferred Risk

> "To pay all sums which *the insured* . . . shall be legally entitled to recover as damages from the owner or operator of *the uninsured automobile* because of bodily injury, sickness or disease, including death resulting therefrom, . . . sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such insured automobile; . . ." (Emphasis added).

We note that the "insured" entitled to recover is defined by the policy as "any person while occupying an insured automobile", and an insured automobile is "the automobile described in the policy", here the 1972 Chevrolet pickup truck in which the decedents were riding at the time of their fatal accident. The policy initially defines "uninsured automobile" as

> "An automobile with respect to the ownership, maintenance or use of which there is no bodily injury liability bond or insurance policy applicable at the time of the accident with respect to any person or organization legally responsible for the use of such automobile."

It is important to emphasize, however, that the policy proceeds to add the following critical phrases: "the term 'uninsured automobile' shall *not* include: (i) an automobile defined herein as an 'insured automobile'; (ii) an automobile owned by the named insured as stated in the policy . . . ." (Emphasis added).

Manifestly, defendants may derive no support from the literal words of the uninsured motorist endorsement; Preferred Risk's wordage expressly forbids that one consider the 1972 Chevrolet truck as an uninsured automobile for purposes of the uninsured motorist coverage. It is therefore apparent that, by the policy's terms, no uninsured motorist coverage could arise as to this action involving Lovelace's alleged negligent use of the Chevrolet pickup truck.

The thrust of defendants' argument for uninsured motorist coverage is based, however, not on the policy's wording but on the effect to be accorded Mississippi's Vehicle Safety Responsibility Act, Miss. Code Ann. § 63–15–43 (1972), and the Mississippi Uninsured Motorist Vehicle Act, Miss.Code Ann. § 83–11–101 et seq. (1972). Defendants contend that these statutes effectuate a modification of the policy's provisions in such manner as to extend protection here.

(d) *The Mississippi Vehicle Safety Responsibility Act.*

The Vehicle Safety Responsibility Act provides, in pertinent part:

> "(1) A 'motor vehicle liability policy' . . . shall mean an owner's or an operator's policy of liability insurance
>
> . . . .
>
> (2) Such owner's policy of liability insurance:
>
> . . . . .
>
> (b) shall pay on behalf of the insured named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured, all sums which the insured shall become legally obligated to pay as damages arising out of the ownership, maintenance or use of such motor vehicle . . . with respect to each such motor vehicle, as follows: five thousand dollars ($5,000.00) because of bodily injury to or death of one person in any one accident and, subject to said limit for one person, ten thousand

dollars ($10,000.00) because of bodily injury to or death of two or more persons in any one accident . . . .

. . . . .

(5) Such motor vehicle liability policy shall not insure:

(a) any obligation for which the insured or any company as his insurer may be held liable under any workmen's compensation law; (b) any liability on account of bodily injury to or death of any employee of the insured while engaged in the employment, other than domestic, of the insured . . . ."

Defendants urge that the Act signifies a legislative intent that all persons who operate motor vehicles in this state are to be covered by liability insurance for the minimum statutory amount and, concomitantly, that persons injured in motor vehicle accidents are to have recourse at least to the specified amount. Defendants therefore would interpret the statutory exclusion of § 63–15–43(5)(a) as prohibiting liability coverage only which would duplicate the benefits offered under workmen's compensation, since in cases of that character the applicable Workmen's Compensation Act provides the exclusive remedy for employees against their employer.

■ Though defendants' interpretation has surface appeal, we must conclude that the Vehicle Safety Responsibility Act makes no such clear-cut guarantee of universal minimum liability coverage. Nowhere does the Act require that licensed operators or owners of motor vehicles have liability coverage in any amount; indeed, there is nothing in the Act to prevent uninsured motorists from operating automobiles on the highway of this state. Moreover, although subsection (5)(a) can plausibly be read as a prohibition on duplication of work-

men's compensation benefits, (5)(b) must, as we shall see, work a wholly different purpose.

■ In any case, although § 63–15–43(5)(a)(b) might suggest the coverage contended for, the plain language of (5)(b) is squarely at odds with that interpretation. Irrespective of whether "the insured" of subsection 5(b) is defined as only the named insured or as any person who may come within the provisions of the omnibus clause,[3] Gattis and Morris were employees of Poole, the named insured, and met their deaths while, together with Lovelace, they were using the vehicle in the course of employment. It is obvious, we think, that subsection (5)(b) was intended to confirm the previously mentioned employee exclusion-clause, whose language it tracks. Further, it is unmistakably clear that the Supreme Court of Mississippi has not adopted defendants' interpretation, since *Benton v. Canal Insurance Co.*, supra, was decided eight years after final passage of the Safety Responsibility Act. Finally, it is significant that the exclusion of (5)(b) expresses the notion of prohibiting insuring "any liability" resulting from the described injury or death, and does not limit its scope to liability of the named insured, in marked contrast to subsection (5)(a). The Mississippi Motor Vehicle Safety Responsibility Act, in our opinion, does not affect Preferred Risk's policy in such manner as to extend liability coverage here.

(e) *Mississippi's Uninsured Motorist Vehicle Act.*

■ Although Preferred Risk's uninsured motorist endorsement purports to explicitly exclude the motor vehicle described in its policy from being regarded as an "uninsured automobile," that does not end our inquiry; instead, it directs the path of our search. At the outset, we note that Mississippi's Uninsured Mo-

---

**3.** Under the omnibus clause

"the unqualified word 'insured' includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or such spouse or with permission of either."

torist Vehicle Act, which was in effect on the date of this accident, incorporates uninsured motorist coverage into all automobile liability insurance policies after the Act's effective date. *United States Fidelity & Guaranty Co. v. Gough,* 289 So.2d 925, 926 (Miss.1974).[4]

█ To the extent that Preferred Risk's endorsement adheres to the command of the Act and effectuates its legislative purpose, the policy provisions, if otherwise lawful, would be judicially enforceable as a matter of course. But if it appears that the Act, as written and as construed by the Supreme Court of Mississippi, grants insurance protection exceeding that provided by the endorsement, "the requirements of the statute are incorporated into and become a part of the policy of the insurance company." *United States Fidelity & Guaranty Co. v. Stafford,* 253 So.2d 388, 391 (Miss.1971);

*Missouri General Ins. Co. v. Youngblood,* 515 F.2d 1254 (5 Cir. 1975). Policy provisions which reduce the mandatory coverage of the Act are nugatory and inoperative. *Talbot v. State Farm Mutual Automobile Ins. Co.,* 291 So.2d 699 (Miss. 1974); *Harthcock v. State Farm Mutual Automobile Ins. Co.,* 248 So.2d 456 (Miss. 1971).

The Uninsured Motorist Vehicle Act, it is to be noted, is a distinct form of motorist insurance legislatively devised[5] to cover certain motorist-connected losses where liability insurance otherwise would not obtain. The sections pertinent to our inquiry are set out in the margin.[6]

█ It is interesting to observe that under the Act, unlike traditional automobile liability insurance, the tort claimant need not first obtain judgment

---

4. Only by rejection in writing can the insured exclude the statutory protection. Miss.Code Ann. § 83–11–101 (1972). In the case sub judice, the parties acknowledge that no such rejection had been made and the uninsured motorist coverage was in full force and effect on the date of the accident. For some reason not clear to the court, Preferred Risk, which brought this suit seeking a declaration of its rights and duties under the policy, neglected to disclose its own uninsured motorist endorsement. Its existence was brought to light only by discovery invoked by defense counsel and specific interrogation by the court.

5. The Mississippi Act was, in fact, largely the product of the insurance industry, who adopted the uninsured motorist concept "as an alternative to publicly administered judgment-funds and compulsory insurance programs." *Rampy v. State Farm Mutual Automobile Ins. Co.,* 278 So.2d 428 (Miss.1973).

6. "No automobile liability insurance policy or contract shall be issued or delivered after January 1, 1967, unless it contains an endorsement or provisions *undertaking to pay the insured all sums which he shall be legally entitled to recover as damages for bodily injury or death from the owner or operator of an uninsured motor vehicle,* within limits which shall be no less than those set forth in the Mississippi Motor Vehicle Safety Responsibility Law, as amended, under provisions approved by the commissioner of insurance. However, the coverage required herein shall not be applicable where any insured named in the policy shall reject the coverage in writing and, unless

the insured requests such coverage in writing, such coverage need not be provided in any renewal policy where the named insured had rejected the coverage in connection with a policy previously issued to him by the same insurer." Miss.Code Ann. § 83–11–101.

"As used in this article, the term 'bodily injury' shall include death resulting therefrom; *the term 'insured' means the named insured and, while resident of the same household, the spouse of any such named insured and relatives of either, while in a motor vehicle or otherwise, and any person who uses, with the consent, expressed or implied, of the named insured, the motor vehicle to which the policy applies, and a guest in such motor vehicle to which the policy applies, or the personal representative of any of the above*; and the term 'uninsured motor vehicle' means a motor vehicle as to which there is (1) no bodily injury liability insurance, or bodily injury liability insurance with limits less than the amounts specified in section 83–11–101, . . . (2) there is such insurance in existence but the insurance company writing the same has legally denied coverage thereunder or is unable, because of being insolvent at the time of or becoming insolvent during the twelve (12) months following the accident, to make payment with respect to the legal liability of its insured within the limits specified in said section 83–11–101, or (3) there is no bond or deposit of cash or securities in lieu of such bodily injury and property damage liability insurance or other compliance with the state financial responsibility law. . . ." Miss. Code Ann. § 83–11–103. (Emphasis added).

against the owner or operator of the uninsured automobile, for the "suit may be brought directly against the insurance company under its insurance contract in the first instance." *Rampy v. State Farm Mutual Automobile Ins. Co.,* 278 So.2d 428, 435 (Miss.1973); *Harthcock v. State Farm,* supra. It also needs no citation that the Act is to be liberally construed to maximize the humanitarian coverage it provides.

The Act's operative command is that the insurer must undertake "to pay the *insured* [as defined in the Act] all sums which he shall be legally entitled to recover from the owner or operator of an *uninsured motor vehicle* . . ." (Emphasis added). The uninsured motorist endorsement of its policy notwithstanding, Preferred Risk nevertheless is required to extend insurance in this case (a) if the Morris and Gattis heirs meet the definition of "insured," and (b) if the Chevrolet pickup truck in which the decedents were riding was an "uninsured motor vehicle." These two criteria, and no more, are germane. In measuring the reach of uninsured motorist coverage, we are guided by the teaching of the Supreme Court of Mississippi as to the general purpose and effect of the Uninsured Motorist Vehicle Act. In *Rampy v. State Farm,* supra, 278 So.2d at 431–32, the Court elucidated:

> "Uninsured motorist coverage or 'family protection insurance', as it is sometimes called, came into existence in 1956 at the behest of insurance companies in an effort on the part of the automobile insurance industry to alleviate some of the problems associated with the rapidly increasing number of uninsured vehicles. In effect, the uninsured motorist policy idea was adopted by the insurance industry as an alternative to publicly administered judgment-funds and compulsory insurance programs. . . .
>
> [T]he vast majority of jurisdictions have stated that the purpose of such uninsured motorist laws is to provide protection to innocent insured motorists and passengers injured as a result

of the negligence of financially irresponsible drivers. A fine pronouncement of the policy considerations underlying uninsured motorist legislation is as follows:

> 'A provision, drawn by the insurer to comply with the statutory requirement of uninsured motorist coverage, must be construed in light of the purpose and policy of the statute. Such a provision, drawn in pursuance of a statutorily declared public policy, is enacted for the benefit of injured persons traveling on the public highways. Its purpose is to give the same protection to the person injured by an uninsured motorist as he would have had if he had been injured in an accident caused by an automobile covered by a standard liability policy. Such provisions are to be liberally construed to accomplish such purpose.' " (Emphasis added).

■ As regards the first criterion, it is obvious that both Gattis and Morris (or rather their death beneficiaries) easily satisfy the statutory and contractual definition of the term "insured." At the time of their fatal accident, both Gattis and Morris, in conjunction with Lovelace, were using Poole's pickup truck with the express consent of the named insured. Concededly, Lovelace had no other liability policy which would insure Morris and Gattis against his negligent operation of Poole's truck.

As regards the second criterion, the vehicle driven by Lovelace would qualify as an "uninsured motor vehicle" except for the special limitation imposed by Preferred Risk's endorsement. The narrow issue thus presented is whether the Uninsured Motorist Act overrides provisions inserted by an insurer which would preclude the applicability of uninsured motorist coverage as to a specific vehicle, but is nevertheless one for which there is no applicable liability insurance. We find persuasive, if not controlling, the recent decision upholding uninsured motorist coverage in *Harthcock v. State*

*Farm,* supra. A discussion of *Harthcock's* facts is instructive.

Shirley Harthcock, while riding as a passenger on a motorcycle owned by Lonzo L. Horne and operated by James P. Horne, sustained bodily injuries when the motorcycle collided with an automobile driven by Gary Roark. Harthcock first sued Roark whose liability carrier, Southern Farm Bureau Insurance Company, having $5,000 applicable limits, settled with Roark for $4,500, reserving to Mrs. Harthcock the right to sue other persons. Harthcock next sued State Farm Mutual Insurance Company on the uninsured motorist coverage of an automobile liability policy issued by State Farm to Harthcock's husband, Clyde Harthcock, Jr. Since Harthcock was a member of her husband's household, she was an insured under the State Farm policy, and she claimed she was entitled to recover from State Farm the limit of its uninsured motorist coverage, which was $5,000 per person. Mrs. Harthcock then filed a separate suit on the uninsured motorist coverage of a policy written by Universal Underwriters Insurance Company to Lonzo L. Horne on the motorcycle involved in the accident, alleging the same acts of negligence as she had made against James P. Horne in the suit against State Farm. Universal Underwriters contended that its liability coverage did not extend to "bodily injury to any person while on or getting on or alighting from the insured vehicle [motorcycle]." Mrs. Harthcock responded that the motorcycle "as defined in the uninsured motorist coverage" was an uninsured motor vehicle and that she was an "insured" under Universal's motorist coverage endorsement, and thus entitled to recover the $5,000 limit of uninsured motorist coverage.

The trial court, in the suits against State Farm and Universal, consolidated for nonjury trial, found that both Roark, the driver of the automobile, and James P. Horne, operator of the motorcycle, were guilty of negligence, and that Mrs. Harthcock, the tort claimant, sustained damages of $14,500. The trial judge then found the motorcycle to be an uninsured vehicle within the meaning of the Act; State Farm's uninsured motorist coverage on the State Farm policy to Harthcock was applicable, but should be credited with $4,500 received by Mrs. Harthcock from Roark's (Southern Farm Bureau) settlement, and held liable for $5,000. The trial court dismissed the suit as to Universal Underwriters. On appeal by Mrs. Harthcock and cross-appeal by State Farm, the Supreme Court, in a unanimous holding, reversed and entered judgment against State Farm for $5,000 and Universal for $5,000; the cross-appeal was affirmed.

It is apparent that the question in the consolidated State Farm and Universal Underwriters defense was whether the motorcycle could be classified as "an uninsured motor vehicle;" and more importantly, whether Universal's policy providing uninsured motorist coverage should be negated because its policy excluded anyone injured while on or getting on or alighting from the motorcycle —i. e., motorcycle passengers such as Mrs. Harthcock. In an opinion ably authored by Presiding Justice (now Chief Justice) Gillespie, the Court held nugatory the words of Universal's policy which sought to restrict the operation of the Uninsured Motorist Vehicle Act. In succinct reasoning, Presiding Justice Gillespie held that notwithstanding the policy provisions, the motorcycle was an uninsured motor vehicle, that Mrs. Harthcock was one intended to be protected by the coverage, and the Act mandated uninsured motorist coverage by Universal as well as by State Farm. The Court's holding makes clear our duty in the case sub judice, for *Harthcock's* teaching is unmistakably expressed in these words:

"There was no bodily injury liability insurance on the motorcycle available to plaintiff because it excluded riders. This Court said in *Hodges v. Canal Insurance Co.,* 223 So.2d 630 (Miss. 1969), that the provisions of the uninsured motorists statute must be construed from the perspective of the injured insured, from whose standpoint

a tort-feasor operating an automobile with no insurance available is an uninsured motorist." 248 So.2d at 458.

"After a careful consideration of the authorities from other jurisdictions and requirements of our statute, we hold that the uninsured motorists coverage of [the Universal as well as the State Farm] policy of liability insurance is available to the injured insured until all sums which he shall be entitled to recover from the uninsured motorist have been recovered. The coverage is mandatory on the insurer and this undertaking cannot be diminished by a provision in the policy." 248 So.2d at 161.

*Harthcock's* rationale was clearly foreshadowed by the pointed observations made earlier by the state supreme court in *Hodges v. Canal Insurance Co.,* supra, which was relied upon in *Harthcock* in pertinent part:

"The purpose of the uninsured motorist provision is to provide the insured a means of collecting that to which he is legally entitled for bodily injuries caused by accident arising out of the ownership, maintenance and use of an uninsured automobile. This provision must be construed from the perspective of the injured insured, from whose standpoint a tort-feasor operating an automobile with no insurance available is an uninsured motorist. It is all the same to him whether there is no insurance at all, or a policy that is incapable of being applied to satisfy his claim because the tort-feasor's insurer lawfully disclaims liability." 223 So.2d at 634.

■■■ Though the facts are dissimilar, *Harthcock* is legally indistinguishable from the instant case. As we have demonstrated, no liability insurance coverage under Preferred Risk's policy is available to the Gattis or Morris death beneficiaries. Viewing the statute from the per-

spective of the injured insured, as *Hodges* and *Harthcock* command us to do, it is beyond cavil that the death vehicle was an "uninsured motor vehicle" under § 83–11–103 and that Preferred Risk has a duty of coverage.

■■■ We therefore hold that Preferred Risk's attempt to exclude Morris and Gattis, as occupants of Poole's pickup truck, from insurance protection under the uninsured motorist endorsement contained in Poole's policy clearly conflicts with the Mississippi Uninsured Motorist Vehicle Act and is ineffectual to deny uninsured motorist coverage to anyone statutorily qualified to invoke such coverage. The terms of the statute and the interpretation given it by the state's highest court, as well as the declared purposes of the automobile insurance industry in providing uninsured motorist coverage, leave no room for Preferred Risk to avoid its uninsured motorist obligations fixed by law.

We declare that Preferred Risk, although freed of any payment responsibility to the Morris and Gattis death beneficiaries as liability insurer to Poole, is nonetheless obligated, within the applicable statutory limits,[7] to pay the death claimants for any losses which may be due to the deaths of Morris and Gattis incurred as the proximate result of Lovelace's negligent operation of Poole's pickup truck.

(f) *Preferred Risk's Duty to Defend.*

■■■ Preferred Risk's liability policy, which we have already found to be inapplicable here, obligates the company to defend its insured, Lovelace's administrator, in a wide variety of actions:

"With respect to such insurance as is afforded by this policy for bodily injury liability and for property damage liability, the company shall:

(a) defend any suit against the insured alleging such injury, sickness,

---

7. Those limits, as established by the Motor Vehicle Safety Responsibility Act, are $10,000.00 for bodily injury to or death of one person in any one accident, and $20,000.00 for bodily

injury to or death of two or more persons in any one accident. Miss.Code Ann. § 63–15–43 (Supp.1975).

**440**

disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent."

Under a long line of Mississippi cases construing legally indistinguishable clauses in liability insurance contracts, it is well settled that "[t]he insurer's ultimate liability is not the criterion for determining whether the insurer is obligated to defend." *Southern Farm Bureau Casualty Ins. Co. v. Logan,* 238 Miss. 580, 119 So.2d 268, 271 (1960). The general rule is that the company's duty to defend is to be determined by the allegations of the complaint in an action against the insured. If those factual allegations bring the action within the circumstances and terms covered by the policy, irrespective of what the actual facts may later prove to be, the company is contractually bound to defend the insured. *State Farm Mutual Automobile Ins. Co. v. Taylor,* 233 So.2d 805 (Miss. 1970); *Mavar Shrimp & Oyster Co. v. United States Fidelity & Guaranty Co.,* 187 So.2d 871 (Miss.1966); *Southern Farm Bureau Casualty Ins. Co. v. Logan,* supra, 119 So.2d at 271. Thus, since the state court complaints do not on their face reveal that any of the previously discussed exclusions from coverage would render the policy inapplicable, Preferred Risk would, in the usual case, be bound to defend in those forums.

But this is not the usual case, for the declaratory judgment which Preferred Risk has obtained in this court settles all questions relating to the applicability of the Preferred Risk liability insurance policy. The facts with respect to the employee and cross-employee exclusions of the policy have already been adjudged, and we have today declared that Preferred Risk has no coverage to the Morris and Gattis heirs under its liability policy. It necessarily follows from this adjudication that Preferred Risk has no duty to defend the pending state court actions under the liability section of its policy. Preferred Risk, however, has the option, should it choose to exercise the same, of interposing a defense in

the state court under its uninsured motorist coverage endorsement to contest whether Lovelace, or his estate, were legally responsible for the accident.

Judgment will be entered accordingly.