UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-60552
_____


CRADDOCK INTERNATIONAL INCORPORATED; PESQUERA MALLA, S.A.,

                                    Plaintiffs-Appellees-
                                    Cross-Appellants.

                    versus

W.K.P. WILSON & SON, INC. ET AL.,

                                    Defendants,

W.K.P. WILSON & SON, INC.,

                                    Defendant-Appellant-
                                    Cross-Appellee.

_____

Appeals from the United States District Court for the
              Southern District of Mississippi
_____
                    June 26, 1997

Before BARKSDALE, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

The M/V *Scotia Seahorse*, a 176-foot offshore supply vessel, sank off the Venezuelan coast en route to Pisco, Peru.  A fish meal processing plant worth approximately $1.7 million sank with the vessel.  Through a remarkable chain of events, the loss of the plant was entirely uninsured.  The vessel owner and the cargo owner brought suit against W.K.P. Wilson & Son, Inc. ("Wilson"), an Alabama marine insurance broker, alleging that the loss was

uninsured because of Wilson's negligence.  This appeal requires us to decide the basis and the extent of Wilson's liability to the vessel owner and the cargo owner.  To facilitate an understanding of the legal issues presented on appeal, we provide a detailed history of the unusual underlying facts.

I.
FACTS

Cradock International, Inc. ("Cradock"),[1] purchased the M/V *Scotia Seahorse* from Marinsa Miami Company ("Marinsa"), a marine equipment supplier.  Cradock, a Panamanian corporation, had two stockholders: Manuel Cabada Celorrio ("Cabada") and Milan Orlic.  Cabada and Orlic formed Cradock to purchase a coastal transport vessel to transport oil and other liquids along the coast of Peru.  Cabada and Orlic are also shareholders in a Peruvian company called Pesquera Malla, S.A. ("PMSA").  PMSA operates a fleet of sardine fishing boats.  Cabada testified that the plan to purchase a coastal transport vessel solidified when PMSA decided to purchase a fish meal processing plant, which PMSA wanted to transport from Carupano, Venezuela to Pisco, Peru.

Ueli Walchli, the majority owner and operator of Marinsa, located the *Scotia Seahorse* in Pascagoula, Mississippi.  Marinsa purchased the *Scotia Seahorse* and then sold it to Cradock.  The first order of business was getting the vessel to Venezuela to pick up the fish meal processing plant.  Acting on Cradock's behalf, Walchli hired Richard Sassman to captain the vessel from Pascagoula

---

[1]  Cradock is misspelled as "Craddock" in the caption of the plaintiffs' complaint as well as in the caption on appeal.

to Venezuela; Captain Sassman in turn hired the crew.

Before the *Scotia Seahorse* left Pascagoula, she was inspected by Jack Bolding, a marine surveyor. He did ultrasound testing of the vessel's hull, which showed that the steel plating was close to its original thickness. Even so, the vessel needed a good deal of cleaning and repair before departure. Bolding inspected the vessel again after the repairs were completed. In a written report, he recommended that another inspection be conducted upon the vessel's arrival in Carupano. He also noted in his written report that the vessel would be scrapped upon arrival in Peru. This notation apparently resulted from a miscommunication; Cradock planned to scrap the vessel only if it was unable to obtain the permits necessary to use it as a coastal transport vessel in Peru.

The vessel left Pascagoula for Venezuela in early September 1989. The trip to Venezuela was not without its difficulties. The *Scotia Seahorse*'s hydraulic steering motors failed, the compressors required repair, and the vessel lost generator power. The generator problems required a stopover in the Cayman Islands for three or four days. Despite these problems, the *Scotia Seahorse* arrived safely in Carupano on September 15th or 16th, 1989, where she was moored at a large cement dock. Cabada was waiting for the *Scotia Seahorse* when she arrived.

Workers began to load PMSA's fish meal processing plant onto the vessel. Cabada helped oversee the loading. Many pieces of equipment were so large that a crane was required to load them. Captain Sassman testified that he expressed concerns to Cabada that

3

they were loading too much cargo and that it was not being loaded properly. Captain Sassman testified that there were two cargo containers and "hundreds" of individual items on the deck of the vessel.

Carupano is an open port, unprotected from the ocean by levies or seawalls. As fate would have it, the effects of Hurricane Hugo were being felt in Carupano at that time. Swells created by the hurricane caused the *Scotia Seahorse* to work against the dock, and steel lines that moored her began to break. Captain Sassman recommended that Cabada postpone loading the rest of the equipment until the swells subsided. Although Cabada did not accede immediately, the *Scotia Seahorse* was eventually unmoored and put to sea for a day or so to avoid damage to the vessel and the dock. At trial Sassman, his memory refreshed by a memorandum from Cabada to an insurance agent, recalled that he had detected a starboard side shell indentation before departure, although he had seen no indication of any fracture. He also testified that a portion of the vessel's starboard side rub rail had collapsed.

A surveyor for Lloyd's of London conducted an inspection on behalf of the hull insurance underwriters immediately before the *Scotia Seahorse* left Carupano. The hull underwriters requested the additional inspection because Bolding had recommended it and because the underwriters knew that cargo would be loaded onto the vessel in Carupano. The notation in Bolding's report that the vessel would be scrapped upon arrival in Peru also appears to have heightened the underwriters' concerns. According to Sassman and

4

Cabada, the Lloyd's surveyor did not inspect the hull but instead examined how the cargo was loaded.

Although Captain Sassman had originally agreed to serve as captain only on the trip from Pascagoula to Carupano, Cabada asked him to stay on for the voyage to Peru. At Cabada's request, Consulmar, a maritime agent, assembled a Venezuelan crew to replace the American crew. Consulmar also prepared the bills of lading for the transport of PMSA's plant.

The *Scotia Seahorse* left Carupano at 9:30 on Sunday morning, September 24, 1989. The weather was fair and clear. Cabada recalled watching the *Scotia Seahorse* as she disappeared over the horizon. Cabada then flew to Caracas, Venezuela to take care of business there. The next morning, Cabada called Domingo Barbiere, who was then the general manager of PMSA, to tell him that the vessel had left Carupano.

Unbeknownst to Cabada, twelve hours after the *Scotia Seahorse* left Carupano, her main engines had come to a dead stop. Captain Sassman's immediate concern was to secure loose acetylene tanks that were working back and forth on deck. As Captain Sassman and the crew attempted to secure the tanks, the vessel began to list. Although he was able to start the port engine, the list worsened. The crew attempted to pump the water from the bilge, but the main bilge pump worked only intermittently. Although Sassman revived the starboard engine at 4:30 a.m., his efforts were to no avail. Around 9:15 a.m. on Monday, September 25th, the *Scotia Seahorse* rolled over and sank to the bottom of the sea.

Captain Sassman jumped from the vessel as she rolled over. The crew had abandoned ship less than an hour before. A Venezuelan naval frigate, the *General Subelet*, was standing by to take Captain Sassman and the crew to Puerto La Cruz, Venezuela.

Behind-the-scenes efforts to obtain marine insurance were almost as ill-fated as the voyage itself. Walchli agreed to help Cabada obtain insurance in the United States, although this was not normally a service provided by his marine equipment supply company, Marinsa. Walchli contacted W.K.P. Wilson & Son, Inc., an insurance broker in Mobile, Alabama,[2] on the recommendation of the marine surveyor Jeff Bolding. Frank Wayne Hall, Sr., an account executive at Wilson, was in charge of the Cradock account. Cabada never spoke with Hall or anyone else at Wilson directly; all communications between Cabada and Wilson were through Walchli or Zarko Kulisic.[3] Kulisic is a shareholder in PMSA and at the time of trial was the general manager of PMSA.

Through Wilson, Walchli obtained for Cradock a $350,000 hull insurance policy with various Lloyd's of London underwriters and a $1 million protection and indemnity ("P&I") policy with West of England Ship Owners Mutual Insurance Association's fixed premium facility. Generally speaking, hull insurance covers the loss or damage of the vessel and its equipment. *See* Raymond P. Hayden &

---

[2] Wilson since has merged with Corroon & Black to become Willis Corroon.

[3] Kulisic was educated in the United States. Because Barbiere did not speak English well, if at all, Kulisic often served as an intermediary and a translator of written correspondence for PMSA.

Sanford E. Balick, *Marine Insurance: Varieties, Combinations, and Coverages*, 66 Tul. L. Rev. 311, 315 (1991). P&I insurance covers shipowners, charterers, and the similar individuals for liabilities to third parties arising out of the operation of the vessel. *Id.* at 327.

Wilson arranged to add PMSA as an additional assured on both the hull and the P&I policies. Whether Hall was told only to add PMSA on the hull policy or on both policies was a matter hotly disputed at trial. The district court resolved this disputed fact issue in the plaintiffs' favor, concluding that Hall was asked only to add PMSA as an additional assured on the hull policy and was not asked to add PMSA as an additional assured on the P&I policy.

PMSA did not obtain first-party cargo insurance[4] for the fish meal processing plant before the *Scotia Seahorse* sank. Cabada originally informed Wilson, through Walchli, that PMSA would arrange for first-party cargo insurance through Napoleon De La Colina, a Peruvian insurance broker. When De La Colina was unable to obtain cargo coverage, he contacted Wilson to ask for assistance. The next day PMSA's Barbiere asked Hall to obtain a quote for cargo insurance. He told Hall that the *Scotia Seahorse* would be ready to depart Carupano in two days. Hall sent a fax to Bain Clarkson Limited, a London insurance brokerage firm, asking for a quote for cargo coverage in the amount of $1,700,000, the value of the cargo to be insured. A fax from Hall to Barbiere on

---

[4] First-party cargo insurance protects the cargo owner against loss or damage of the cargo.

September 21 indicated that the underwriters were "working on a [q]uote for cargo . . . ," but that Hall was still unable to confirm cargo coverage. Hall was out of the office on Friday, September 22, and left the matter in the hands of another Wilson employee. He testified that she knew of the urgency of obtaining the cargo insurance quote. Hall did not know whether she attempted to contact Bain Clarkson that Friday or whether anyone from PMSA or Cradock contacted his office that day.

The district court found that in the meantime there was a "fatal communications breakdown" between PMSA and Cradock. Cabada apparently thought that the inspection conducted by the Lloyd's surveyor in Carupano was for the purpose of securing cargo coverage. Once the inspection was completed, he believed that the *Scotia Seahorse* was free to go with first-party cargo insurance in place. Similarly, Kulisic testified that he did not know that the inspection in Carupano was required by the hull insurers rather than the cargo insurers. Kulisic conceded, however, that he did not have confirmation of cargo coverage before the *Scotia Seahorse* set sail from Carupano. On September 26th, Hall obtained a quote from Bain Clarkson for the cargo coverage. Unaware that the *Scotia Seahorse* had sunk the day before, Hall faxed the quote to Barbiere in Peru.

When Kulisic and Barbiere learned that the *Scotia Seahorse* had sunk, they asked Walchli to inform Wilson of the loss and to remit any unpaid premiums. Walchli testified that Hall told him that Cradock should pay the outstanding premium on the hull and P&I

8

policies, but that no premium should be remitted by PMSA for first-party cargo coverage because cargo insurance had not been placed before the *Scotia Seahorse* sank.

When the *Scotia Seahorse* sank, the outstanding unearned premium for the rest of the year on Cradock's P&I policy was approximately $39,000. Hall testified that Kulisic was adamant that Cradock expected no claims under the P&I policy. Kulisic's primary concern, according to Hall, was getting the London underwriters to consider a claim under the hull policy. The hull policy contained a clause under which the full annual premium was deemed due in the event of total loss. Thus, before the hull underwriters would even consider a claim under the hull policy, Cradock was required to pay the full annual premium.

As a cost-saving measure, Hall suggested that the P&I policy could be canceled retroactively as of the date of the sinking. Hall said that Kulisic had informed him that no crew members had made any claims, that they would not have to move the vessel because it rested in deep waters, and that Cradock foresaw no claims against the P&I policy.[5]

Bain Clarkson arranged the retroactive cancellation with West of England on the condition that Cradock stipulate that there would be no claims against the P&I policy. Hall claims that he tried to negotiate a milder stipulation, but the underwriters would settle for no less. Hall never told Cradock of his efforts to "soften the blow" of the stipulation demanded by the underwriters. He

---

[5] Kulisic's testimony flatly contradicted Hall's.

9

testified that the stipulation was consistent with his conversations with Kulisic and Walchli and claimed to have discussed the consequences of cancellation with both men.

Hall insisted that there was no indication at the time the P&I policy was canceled that there might be a third-party cargo legal liability claim by PMSA against Cradock and that he became aware of this possibility only when PMSA made a formal claim against Cradock. On the advice of its attorney, PMSA made a formal claim on Cradock in January of 1990, and filed a lawsuit against it in Peru on August 15, 1990.[6]

When Hall learned of the PMSA claim, he forwarded this information to Bain Clarkson. Bain Clarkson reminded Hall that the P&I policy had been canceled at the assured's request, but suggested that if Cradock paid a reinstatement premium of approximately $39,000, there was a good chance that the underwriters would reinstate the canceled P&I coverage. In a letter dated March 22, 1990, Hall informed Cradock that the P&I policy could be reinstated for $39,000. Hall repeatedly reminded Cradock that to seek reinstatement of the P&I policy, it would need to pay the full reinstatement premium. A year and a few months after Hall first suggested the possibility of reinstatement, Cradock remitted the premium. By that time, West of England had

---

[6] At the time of trial, that suit had not been resolved. The district court proceeded on the assumption that Cradock would be held liable to PMSA for the entire value of the lost cargo. Wilson does not challenge the assumption that Cradock would have some amount of liability to PMSA but does argue that the Cradock would not be liable to PMSA for the full amount of the loss. *See infra* Part III.C.

10

abandoned the underwriting function of its fixed premium facility, which had originally underwritten Cradock's P&I policy, and was performing only a claims resolution function. Accordingly, West of England was unwilling to reinstate the policy when Cradock finally remitted to the premium to Wilson.

## II.
### PROCEDURAL HISTORY

The case was tried to the bench. Cradock and PMSA advanced several theories of liability against Wilson: that Wilson negligently added PMSA as an additional assured on both the P&I policy and the hull policy; that Wilson negligently canceled the assureds' P&I policy without adequately consulting them about the consequences of doing so; that Wilson failed to recommend an adequate policy limit for the P&I policy; and that Wilson negligently delayed in obtaining first-party cargo insurance for PMSA.

The district court found that Wilson negligently arranged for PMSA to be added as an additional assured on both Cradock's hull and P&I policies, although it had been asked only to add PMSA as an additional assured on the hull policy. The district court also found that Wilson had breached its duty by canceling the P&I policy without adequately consulting the assureds about the terms of the cancellation. The district court, however, concluded that the breach of duty resulting from the cancellation was not "prejudicial." Phrased in negligence terms, the district court concluded that Wilson's breach of duty was not the proximate cause of any damage to the plaintiffs. The district court concluded that

11

by adding PMSA as an additional assured on the P&I policy, Wilson abrogated Cradock's legal liability coverage for the loss of PMSA's cargo because of a limitation on coverage of the "Assured's own cargo." Thus, in the district court's view, even if the P&I policy had not been canceled, it would not have covered Cradock's liability for the loss of PMSA's cargo because PMSA had been added as an additional assured on the P&I policy. The district court found against Cradock and PMSA on the other two theories of negligence advanced.

The district court awarded PMSA and Cradock $1 million, the coverage that the district court concluded that Cradock would have had under the policy, but for Wilson's breach of duty.[7] Wilson challenges the amount of the award, claiming that Cradock's coverage under the P&I policy was subject to a limitation-of-coverage clause in the policy. Wilson also argues that Cradock's liability to PMSA was limited by a limitation-of-liability clause in the bill of lading, which in turn would have limited West of England's indemnity obligation.

The district court determined that Alabama law should govern, but that Mississippi would apply its own comparative negligence scheme because Alabama's contributory negligence bar offended

---

[7] Cradock and PMSA also list the district court's failure to award prejudgment interest as a point of error, but fail to provide any argument or authority to support this point. Consequently, that point has been abandoned. *Justiss Oil Co. v. Kerr-McGee Ref. Corp.*, 75 F.3d 1057, 1067 (5th Cir. 1996) (citing *Gann v. Fruehauf Corp.*, 52 F.3d 1320, 1328 (5th Cir. 1995); *Green v. State Bar of Texas*, 27 F.3d 1083, 1089 (5th Cir. 1994)). At oral argument, counsel for Cradock and PMSA acknowledged that this point of error had been abandoned.

Mississippi's public policy.  None of the parties challenge the district court's choice-of-law determinations.  We review *de novo* the district court's resolution of legal issues, including issues of contractual interpretation, and review the district court's factual findings for clear error.  *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 458–59 & n.3 (5th Cir. 1995).

### III.
#### DISCUSSION

#### A.

The district court concluded that Wilson's negligence in adding PMSA as an additional assured under the P&I policy eliminated Cradock's coverage for the loss of PMSA's cargo.  As a result, the district court concluded that PMSA's and Cradock's damages flowed from the negligent addition of PMSA rather than from Wilson's negligent cancellation of the P&I policy.  Under the district court's reading of the policy, Wilson's negligent cancellation of Cradock's P&I policy did not harm Cradock or PMSA: even if the policy had remained in effect, Cradock would not have been covered for the loss of PMSA's cargo because of a provision in the P&I policy that limits coverage for the loss or damage of the assured's own cargo.  By way of cross appeal, PMSA and Cradock contend that the district court erroneously concluded that adding PMSA as an additional assured on the P&I policy eliminated Cradock's coverage for the loss of PMSA's cargo.

13

Cradock's P&I policy with West of England included cargo legal liability coverage.[8]  The policy was based on Form SP-23, a common marine insurance form P&I policy, as modified by West of England's standard P&I clauses.  Clause 8 of Form SP-23 provides cargo legal liability coverage:

> The Assurer hereby undertakes to make good to the Assured . . . all such loss . . . as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth:
> . . .
> (8)  Liability for loss of, or damage to, or in connection with cargo . . . to be carried, carried, or which has been carried on board the vessel named herein . . . .

Although West of England's standard P&I clauses exclude Clause 8, the cover note indicates that cargo legal liability coverage is included, if required.  As the district court explained, cargo legal liability coverage was included in Form SP-23, excluded by the West of England standard P&I clauses, and then reinstated as indicated by the cover note.  Despite the district court's conclusion that Clause 8 would have applied as written had the policy not been canceled, the court determined that any coverage provided by the P&I policy's cargo legal liability clause for PMSA would have been effectively eliminated by Clause 8(cc).  That clause drastically limits coverage for the "Assured's own cargo":

Assured's own cargo
> (cc) Where cargo on board the vessel named herein is the property of the Assured, such cargo shall be deemed to be carried under a contract containing the protective clauses described in the preceding

_____

[8]  Cargo legal liability coverage insures against liability for the loss of another's cargo.

14

> paragraph, and such cargo shall be deemed to be fully insured under the usual form of cargo policy, and in case of loss thereof or damage thereto the Assured shall be insured hereunder in respect of such loss or damage only to the extent that they would have been covered if said cargo had belonged to another, but only in the event and to the extent that the loss or damage would not be recoverable under a cargo policy as hereinbefore specified.

The district court reasoned that PMSA's cargo was "the property of the Assured" because PMSA was an additional assured on the P&I policy. As "property of the Assured," the cargo would be deemed to be fully covered by a first-party cargo insurance policy. Accordingly, the district court concluded, the underwriters would have had no obligation to indemnify Cradock for Cradock's third-party liability to PMSA for the loss of its cargo even if the policy had remained in effect. We disagree.

The issue is what "assured" means in Clause 8(cc) when one assured asserts coverage under the policy for its liability for the loss of *another* assured's cargo. It is important to bear in mind that the issue is not PMSA's coverage under the policy for the loss of its own cargo. Rather the issue is Cradock's third-party coverage under the policy for its liability to PMSA for the loss of PMSA's cargo. That PMSA, as an additional assured, is not insured *directly* under the policy for loss of its own cargo does not necessarily mean that the policy does not cover Cradock's third-party liability to PMSA.

15

The Assured's Own Cargo clause can be construed in at least two ways. The clause can be construed to exclude[9] coverage if the lost or damaged cargo is the property of "any assured" regardless of which assured is asserting coverage under the policy. Alternatively, the clause can be construed to exclude coverage if the lost or damaged cargo is the property of the assured asserting coverage under the policy.

We conclude that the more reasonable and consistent reading of the P&I policy as a whole is that it insures Cradock for Cradock's third-party liability for the loss of another person's cargo, including PMSA's. As the marginal note indicates, the exclusion applies to the "Assured's own cargo." Clause 8(cc) limits only PMSA's coverage under the policy for the loss of PMSA's own cargo, and Cradock's coverage under the policy for the loss of Cradock's own cargo. Choosing this interpretation comports with the fundamental principle that an ambiguous insurance contract provision must be construed against the insurer who drafted it. *Employers Ins. of Wausau v. Trotter Towing Corp.*, 834 F.2d 1206, 1210 (5th Cir. 1988); *see also Lynd v. Reliance Standard Life Ins. Co.*, 94 F.3d 979, 986 (5th Cir. 1996)(Dennis, J., dissenting) (noting that "according to the law of every state and the District of Columbia, ambiguities in insurance contracts must be construed against the insurer") (citations omitted).

_____

[9] Technically, this provision does not "exclude" coverage, but limits coverage to any amount not recoverable under a standard first-party cargo policy. We use the term "exclude" as shorthand for the limiting function of the clause.

16

The parties have not cited, nor has our research uncovered, any precedent construing Form SP-23's Assured's Own Cargo limitation of coverage. But the courts have addressed an analogous dilemma: whether a clause excluding coverage for injuries suffered by an "employee of the insured" excludes coverage of one insured's liability for an injury to an employee of another insured. Most courts addressing the issue have concluded that the employee exclusion should be construed to exclude coverage only if the claimant is the employee of the insured who is asserting coverage under the policy. *See, e.g.*, *United States v. Transport Indem. Co.*, 544 F.2d 393, 395 (9th Cir. 1976); *Float-Away Door Co. v. Continental Cas. Co.*, 372 F.2d 701, 708-09 (5th Cir. 1966), *cert. denied*, 389 U.S. 823, 88 S. Ct. 58, 19 L.Ed.2d 76 (1967); *Wilson v. State Farm Mut. Auto. Ins. Co.*, 540 So.2d 749, 751-52 (Ala. 1989); *Employers Mut. Liab. Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 549 S.W.2d 267, 268 (Ark. 1977); *United States Fid. & Guar. Co. v. Globe Indem. Co.*, 327 N.E.2d 321, 323 (Ill. 1975); *Pullen v. Employers' Liab. Assurance Corp.*, 89 So.2d 373, 377 (La. 1956); *United States Fidelity & Guar. Co. v. PBC Prods., Inc.*, 451 N.W.2d 778, 779-80 (Wis. App. 1989); *Pacific Indem. Co. v. Transport Indem. Co.*, 146 Cal. Rptr. 648, 650-61 (Cal. App. 1978). *But see, e.g.*, *Desrosiers v. Royal Ins. Co.*, 468 N.E.2d 625, 628 (Mass. 1984); *Preferred Risk Mut. Ins. Co. v. Poole*, 411 F. Supp. 429, 433-34 (N.D. Miss.), *aff'd*, 539 F.2d 574 (5th Cir. 1976) (Mississippi law). Although none of these cases control the issue before us, we find the majority view persuasive. Indeed, in *Float-*

17

*Away Door*, this circuit concluded that "[t]he better reasoned cases adopt a restrictive interpretation of 'the insured' as referring only to the party seeking coverage under the policy." 372 F.2d at 708 (citing *Maryland Cas. Co. v. American Fidelity and Cas. Co.*, 217 F. Supp. 688 (E.D. Tenn. 1963)). We explained that the purpose of the employee exclusion is not advanced by applying it to exclude coverage when the insured is not the employer of the injured party:

> The primary objective of such exclusionary clauses is to avoid duplication of coverage with respect to compensation insurance. With that purpose in mind, there seems to be no reason why an insured should not be indemnified against the claim of an employee outside of that insured's employment.

372 F.2d at 708-09.

Similarly, our interpretation comports with the underlying purposes of the Assured's Own Cargo limitation. Clause 8(cc) appears to serve two primary purposes. First, it prevents the assured from using the P&I policy as a form of first-party cargo insurance and thus creates an incentive for P&I assureds to purchase first-party insurance for their own cargo. Second, it prevents duplicative coverage. An assured who loses its own cargo, which by industry custom should be insured by first-party cargo insurance, is not covered under both its P&I policy and its first-party cargo policy. P&I coverage under the vessel owner's policy is not intended to be the primary method of insuring against cargo loss.

If Clause 8(cc) is applied to limit Cradock's coverage for PMSA's cargo-loss claims, its aims are not fulfilled. If PMSA had obtained first-party cargo insurance, that would not have helped

18

Cradock one whit with respect to its liability for the loss of PMSA's cargo. Even if PMSA's cargo had been covered by first-party cargo insurance, that would not have insulated Cradock from its liability for the loss; PMSA's first-party cargo insurer would have had subrogation rights against Cradock. *See* Michael F. Sturley, *The Fair Opportunity Requirement under COGSA Section 4(5)*, 19 J. MAR. L. & COM. 157, 180 (1988). Thus, Cradock's need for coverage of its liability to PMSA does not vary depending on whether PMSA, an additional assured under its P&I policy, has first-party cargo insurance.

Instead of preventing duplicative coverage, the district court's interpretation creates a gaping hole in Cradock's liability coverage under the P&I policy. In this case, it eliminates third-party cargo liability for the only cargo loss for which Cradock conceivably could have needed cargo legal liability coverage.

For these reasons, we conclude that the term "assured" in the Assured's Own Cargo clause should be construed to mean the party asserting coverage under the policy. Accordingly, each assured would have liability coverage for the loss of another's cargo, including another assured, but would not have coverage for the loss of its own cargo.

Because we conclude that Cradock's P&I policy would have covered its liability to PMSA for the loss of PMSA's cargo, the cancellation of the policy was a cause of PMSA's and Cradock's damages. By the same token, adding PMSA as an additional assured was not prejudicial. Thus, we need not consider the issues raised

19

by Wilson challenging the district court's determination that Wilson was negligent in adding PMSA as an additional assured on the P&I policy.[10]

B.

The district court's decision that the cancellation of the policy was not prejudicial pretermitted its consideration of whether Cradock or PMSA negligently notified Wilson that Cradock expected no claims under the P&I policy, thus arguably contributing to Wilson's negligent cancellation of the P&I policy. The district court also had no occasion to consider whether Cradock was comparatively negligent by delaying to pay a premium to reinstate the P&I policy when informed that it could do so. Accordingly, we will remand to allow the district court an opportunity to make comparative negligence findings.

The district court correctly declined to make a comparative negligence finding with respect to PMSA's failure to obtain first-

---

[10] Wilson argued that the district court erred in finding that it was negligent for adding PMSA as an additional assured because the district court's finding was not supported by expert testimony, because it used hindsight rather than foresight to evaluate Wilson's conduct, and because its finding that Wilson was instructed only to add PMSA on the hull policy was clearly erroneous.

Wilson's complaint on appeal that the district court's negligence finding was not supported by expert testimony was not directed toward the finding that Wilson breached a duty by canceling the P&I policy without adequately counseling his assureds. Even if the argument applied to the district court's negligent cancellation finding, the testimony of plaintiffs' expert, Robert Breeden, supports the district court's finding that Wilson's conduct in connection with the cancellation was in breach of its duties as a broker. We express no opinion regarding whether Alabama law would require expert testimony in a lawsuit against an insurance agent or broker.

20

party cargo insurance before the vessel left port. PMSA's negligence in this regard, if any, did not contribute to the loss of Cradock's third-party liability coverage, which is the only basis upon which damages were awarded by the district court.

The district court also noted that Cradock "did not exercise due diligence to ensure that the vessel was seaworthy prior to departure." Wilson argues that the district court should have reduced Cradock's recovery because of Cradock's failure to exercise due diligence. We disagree. There is no indication that the P&I policy would not have provided coverage if the loss resulted from the assured's failure to exercise due diligence.[11] An insurance broker who negligently cancels liability coverage cannot claim a reduction of damages if the underlying loss was caused by an insured event, even if that event was caused by the assured's lack of due diligence. Thus, the district court properly declined to reduce Cradock's and PMSA's damages to reflect any negligence that contributed to the sinking of the *Scotia Seahorse*.

We remand to the district court to make comparative negligence findings not inconsistent with this opinion.

C.

The district court awarded PMSA and Cradock $1 million, the limits of Cradock's P&I policy. This award represents the amount

---

[11] Indeed, if Cradock *had* exercised due diligence in making the vessel was seaworthy, it is likely that no indemnity obligation would have arisen under the P&I policy. Under Clause 8(bb), the bill of lading was deemed to have a clause that would have exempted Cradock from liability if Cradock had exercised due diligence in ensuring that the vessel was seaworthy.

21

of coverage that the district court concluded that Cradock would have had under its P&I policy but for Wilson's negligence. For the purpose of analyzing damages, we necessarily consider the coverage to which Cradock would have been entitled had the P&I policy remained in effect.

Cradock's P&I policy contains a limitation-of-coverage clause that purports to limit the insurer's indemnification obligation to $250 per customary freight unit. The district court implicitly held that the "customary freight unit" in this case was the entire shipment.[12] Thus, the clause, if applicable, would limit Cradock's liability to $250. The district court, however, concluded that Wilson was prevented from invoking this limitation-of-coverage clause because PMSA had not been given a "fair opportunity" to avoid the limitation under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.* On appeal, Wilson reasserts the policy's limitation of coverage and also attempts to rely on a limitation-of-liability clause in the bills of lading between PMSA and Cradock.

### 1.

The bills of lading issued by Cradock to PMSA provide that any terms not stated explicitly in the bills of lading are governed by

---

[12] The district court made no explicit finding that the customary freight unit in this case was the entire fish meal processing plant, but its discussion clearly supports an implicit finding to that effect. The court cites with approval authority holding that if the freight charge is a "lump sum," then the relevant customary freight unit is the entire shipment. The district court then found that the relevant bills of lading show that the plant was shipped based on a lump-sum basis.

22

the Brussels Convention of August 25, 1924, commonly referred to as the "Hague Rules." *See Associated Metals & Minerals Corp. v. Alexander's Unity MV*, 41 F.3d 1007, 1015 (5th Cir. 1995). The bills of lading do not state a limit for the carrier's (here, Cradock's) liability. Under article 4(5) of the Hague Rules, however, the carrier's liability is limited to £ 100 sterling per unit or package. *See* Brussels Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, Aug. 25, 1924, 51 Stat. 233, 120 L.N.T.S. 155. Wilson asserts for the first time on appeal that Cradock's liability to PMSA is limited to £ 100 sterling under the Hague Rules, that West of England's indemnification obligation in turn would have been so limited, and accordingly that Wilson's liability should be limited as well.

We conclude that Wilson forfeited this argument by failing to raise it in the court below. To prevail on an issue raised for the first time on appeal, an appellant must show a plain (clear or obvious) error that affects substantial rights. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1423 (5th Cir. 1996) (en banc); *see also Highlands Ins. Co. v. National Union Fire Ins. Co. of Pittsburg*, 27 F.3d 1027, 1032 (5th Cir. 1994) (applying the plain error standard to a party's failure to challenge a jury charge in the district court), *cert. denied*, 513 U.S. 1112, 115 S. Ct. 903, 130 L.Ed.2d 786 (1995). If the trial court committed a plain error that affects a party's substantial rights, we may correct the error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507

23

U.S. 725, 736, 113 S. Ct. 1770, 1779, 123 L.Ed.2d 508 (1993), *quoted in Douglas*, 79 F.3d at 1424. Wilson has not made the requisite showings in this case.

Without citation, Wilson also argues that it had no burden to raise this issue in the district court because the limitation-of-liability clause was a matter that Cradock and PMSA were obligated to negate in the course of proving damages.[13] We disagree. A limitation of liability is, in general, a defensive matter that must be raised in the trial court by the party seeking to benefit from the limitation. *Cf. Ingraham v. United States*, 808 F.2d 1075, 1078 (5th Cir. 1987)(holding that a statutory limitation of liability is an affirmative defense); *Manion v. Pan American World Airways, Inc.*, 434 N.E.2d 1060, 1062 (N.Y. 1982)(holding that limitation of liability under the Warsaw Convention is an affirmative defense); *see* HAWKLAND ET AL., UCC SERIES § 7-309:08 (1986)("A contractual limitation-of-liability clause is an affirmative defense and the carrier has the burden to establish that the limitation is in effect."). We conclude that Wilson forfeited the argument that its liability is limited by the Hague Rules because it failed to raise this argument in the court below.

2.

Wilson also contends that the district court should have given effect to Clause 8(bb) of Cradock's P&I policy, which represents an

---

[13] Wilson also claims that this issue was preserved for appeal because Wilson listed the "nature and extent of plaintiffs' damages, if any" as a disputed issue in the pretrial order. We are not persuaded that this oblique reference to damages in the pretrial order preserved the issue for our review.

24

attempt to limit West of England's indemnification obligation.  The

relevant paragraphs of the clause provide:

> When cargo is carried by the vessel named herein under a
> bill of lading . . . subject or made subject to the
> Carriage of Goods by Sea Act, April 16, 1936, liability
> hereunder shall be limited to such as is imposed by said
> Act, and if the Assured or the vessel named herein
> assumes any greater liability or obligation than the
> minimum liabilities and obligations imposed by said Act,
> such greater liability or obligation shall not be covered
> hereunder.

> When cargo is carried by the vessel named herein under a
> . . . bill of lading ... not subject or made subject to
> the Carriage of Goods by Sea Act, April 16, 1936,
> liability hereunder shall be limited to such as would
> exist if said . . . bill of lading . . . contained the
> following clauses: a clause limiting the Assured's
> liability for total loss or damage to goods shipped to
> Two Hundred and Fifty ($250) Dollars per package, or in
> case of goods not shipped in packages, per customary
> freight unit . . . .[14]

The district court declined to limit Wilson's indemnification

obligation under either of these paragraphs.  Instead, it held that

Clause 8(bb) "activated" COGSA and that COGSA's judicially created

fair opportunity doctrine barred Wilson's reliance on the

limitation because Wilson failed to show that PMSA had been given

---

[14]  The balance of the paragraph lists other specific clauses
that are deemed to be in the assured's bill of lading:

> . . .a clause exempting the Assured and the vessel named
> herein from liability for losses arising from
> unseaworthiness, even though existing at the beginning of
> the voyage, provided that due diligence shall have been
> exercised to make the vessel seaworthy and properly
> manned, equipped, and supplied; a clause providing that
> the carrier shall not be liable for claims in respect of
> cargo unless notice of claim is given within the time
> limited in such Bill of Lading and suit is brought
> thereon within the limited time prescribed therein; and
> such other protective clauses as are commonly in use in
> the particular trade; provided the incorporation of such
> clauses is not contrary to law.

25

a "fair opportunity" to avoid the limitation. Wilson maintains that the district court erroneously applied the fair opportunity doctrine to prevent Wilson from invoking the P&I policy's limitation-of-coverage clause.[15]

COGSA is the United States' "statutory codification of the Hague Rules." *Associated Metals & Minerals Corp.*, 41 F.3d at 1016; *see also* WILLIAM TETLEY, MARINE CARGO CLAIMS 1102 (1988)(noting that COGSA "incorporates the Hague Rules 1924 with some changes"). Under COGSA, a carrier's liability is limited to $500 per package or, if the goods are not shipped in packages, per customary freight unit. *See* 46 App. U.S.C. § 1304(5). American courts have given a common-law gloss to COGSA, however, and required that before a carrier can benefit from COGSA's limitation of liability or a contractual one, the cargo owner must be given a "fair opportunity"

---

[15] Cradock and PMSA argue that Wilson's position on appeal with respect to COGSA's fair opportunity doctrine is inconsistent with its position in the district court. As Cradock and PMSA point out, language in Wilson's supplemental post-trial brief was quite broad. In that brief, Wilson stated that "[i]t is obvious that this section seeks to incorporate the rights and liabilities outlined in COGSA § 4(5), as the exact language of COGSA is mirrored in Section 8(bb)." However, we conclude that Wilson's position on appeal is not inconsistent with its position in the court below. Read in context, the sentence highlighted by PMSA and Cradock was directed only to asking the district court to apply COGSA precedent to ascertain the meaning of "customary freight unit." Cradock's and PMSA's reply to Wilson's supplemental post-trial brief contains the first reference in the record to the fair opportunity doctrine. Thereafter, Wilson maintained that the fair opportunity doctrine should not vitiate the limitation-of-liability clause in the P&I policy or alternatively that PMSA had been given a fair opportunity. In its order on Wilson's motion to alter or amend the judgment, the district court acknowledged and rejected Wilson's argument that the fair opportunity doctrine should not apply. We conclude that Wilson is not foreclosed from arguing that the district court should not have applied the fair opportunity doctrine.

26

to avoid the limitation. *See, e.g.*, *Couthino, Caro & Co. v. M/V Sava*, 849 F.2d 166, 169 (5th Cir. 1988); *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 420 n.11 (5th Cir. 1981). The fair opportunity doctrine appears to be unique to the United States' interpretation of the Hague Rules. *See Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 900 n.7 (9th Cir. 1989) (discussing Sturley, *supra* at 165).

We hold that COGSA's fair opportunity doctrine does not overcome the P&I policy's limitation of coverage for two simple reasons: COGSA does not govern the contract between PMSA and Cradock by its own force or by agreement, and the insurance policy does not "activate" COGSA.[16]

The first quoted paragraph of Clause 8(bb) applies only to contracts that are "subject or made subject to" COGSA. COGSA governs "contracts for carriage of goods by sea to or from ports of the United States in foreign trade." 46 App. U.S.C. §§ 1300, 1312. In this case, the underlying contracts between Cradock and PMSA did not involve or contemplate shipments to or from the United States; the bills of lading governed the transport of cargo from Venezuela to Peru. Accordingly, COGSA did not govern the underlying bills of lading by operation of law. *In re Isbrandtsen Co.*, 201 F.2d 281,

---

[16] We note also that COGSA's fair opportunity doctrine has never been applied to a limitation-of-coverage clause in the marine insurance context. *Cf. Crown Zellerbach Corp. v. Ingram Indus., Inc.*, 783 F.2d 1296, 1297 (5th Cir.) (en banc)(upholding a clause that limited a P&I insurer's liability to the "shipowner's judicially declared limitation of liability"), *cert. denied*, 479 U.S. 821, 107 S. Ct. 87, 93 L.Ed.2d 40 (1986). The fair opportunity doctrine has been applied to nullify only limitations of liability as between carriers and shippers.

27

285 (2d Cir. 1953). Even so, Cradock and PMSA could have agreed to incorporate COGSA in the bills of lading. *See* 46 App. U.S.C. § 1312. But they did not. The bills of lading in this case designate the Hague Rules (as adopted at the Brussels Convention of 1924) to fill in any gaps in the contract. Paragraph 2 of the bills of lading states: "Regarding whatever terms are not here stated explicitly[,] the Brussels Convention of August 25, 1924 shall apply in regard to certain clauses concerning the Bills of Lading." Because the bills of lading are not "subject or made subject to" COGSA, the first paragraph of Clause 8(bb) of the P&I policy does not apply.

The district court nevertheless concluded that the P&I policy activated COGSA, apparently because the second quoted paragraph of Clause 8(bb) contains language and concepts borrowed from COGSA, such as "customary freight unit," notice requirements similar to those under COGSA, and the due diligence defense. It is difficult to see how the second paragraph — which explicitly states that it applies when COGSA does not[17] — can be interpreted to "activate" COGSA.

Even if the second quoted paragraph of Clause 8(bb) is construed to "incorporate" fully certain COGSA concepts, that does not mean that COGSA in its entirety, along with the judicially created fair opportunity doctrine, applies through the policy. *See Croft & Scully Co. v. M/V Skulptor Vuchetich*, 664 F.2d 1277, 1280

---

[17] The clause is applicable only "[w]hen cargo is carried . . . under a . . . bill of lading . . . not subject or made subject to the Carriage of Goods by Sea Act. . . ."

28

(5th Cir. 1982) ("[W]hen COGSA does not apply of its own force but is incorporated into a maritime contract by reference, it does not have 'statute rank'; rather, it is merely a part of the contract, a term like any other . . . .") (quoting *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*, 607 F.2d 322, 325 (4th Cir. 1979)) (internal citations omitted). It is well established that parties who are not subject to a statute may choose to use parts of the statute to define their relationship without bringing the full force of the statute to bear. *Ralston Purina Co. v. Barge Juneau & Gulf Carib. Marine Lines*, 619 F.2d 374, 376 (5th Cir. 1980) ("There can be no doubt that if they had wanted to, the drafters of this contract could have identified specific provisions or sections of COGSA and incorporated them by individual reference. Surely no one could then argue that by doing so all the provisions of COGSA would apply.").

The stated limitation of coverage, $250 per package or customary freight unit, provides yet another indication that the parties did not intend to import COGSA wholesale. As previously mentioned, $500 is the minimum limitation of liability per customary freight unit under COGSA. 46 App. U.S.C. § 1304(5).

The plain language of the clause limits the insurer's indemnification obligation to the liability that "would exist" if Cradock had included a clause in the bill of lading limiting its liability to $250 per customary freight unit. The practical effect of this clause is that if COGSA does not apply, and if the law governing the shipping contract does not provide a limitation of

29

liability, the carrier must limit its liability contractually to $250 per package or customary freight unit or risk incurring liabilities for which it will not be entitled to indemnity. Under the plain language of the contract, an insurer is not required to indemnify the assured for liability exceeding $250 per customary freight unit, regardless of whether the assured has in fact limited its own liability to a potential claimant.[18]

Because COGSA does not apply to the underlying bills of lading either by its own force or by contract and because the P&I policy does not activate COGSA, COGSA's fair opportunity doctrine would not have prevented West of England from invoking the policy's limitation-of-coverage provision. Accordingly, we conclude that the district court erred in awarding Cradock and PMSA the limits of the P&I policy. We turn now to determining the extent to which the limitation-of-coverage provision would have limited Cradock's coverage.

D.

Clause 8(bb) of the P&I policy limits coverage under the P&I policy to the liability that would exist if the bills of lading between Cradock and PMSA had contained a clause limiting liability to $250 per package or customary freight unit. According to the

---

[18] If the cargo owner/shipper were to opt to avoid the limitation of liability (either a statutory limitation or one in a bill of lading or contract) by declaring a higher value and paying additional freight, nothing would prevent the shipowner/carrier from negotiating with the insurance company for additional coverage under the P&I policy. In fact, the policy specifically provides: "The foregoing provisions as to the contents of the Bill of Lading and the limitation of the Assurer's liability may . . . be waived or altered by the Assurers on terms agreed, in writing."

30

unappealed findings of the district court, the cargo was not shipped in "packages." Thus, to determine the coverage to which Cradock would have been entitled under the P&I policy, we must determine what constituted the "customary freight unit" for this shipment.

Although COGSA does not govern the parties' relationship, we look to COGSA cases for guidance in interpreting the term "customary freight unit" because this term is evidently unique to COGSA. *See* TETLEY, *supra* at 1102. Indeed, the cases relied upon by the parties to interpret the phrase "customary freight unit" were all governed by COGSA.

This circuit has interpreted the term "customary freight unit" to mean "the *unit of quantity, weight or measurement* of the cargo customarily used as the basis for the calculation of the freight rate to be charged." *Croft & Scully Co.,* 664 F.2d at 1281 (emphasis in original)(quoting *Waterman S.S. Corp. v. United States S.R. & M. Co.*, 155 F.2d 687, 693 (5th Cir.), *cert. denied*, 329 U.S. 761, 67 S. Ct. 115, 91 L.Ed. 656 (1946)). Customary freight unit "refers to the unit upon which the charge for freight is computed and not to the physical shipping unit." *Id.* (quoting *Caterpillar Americas Co. v. S/S Sea Roads*, 231 F. Supp. 647 (S.D. Fla. 1964), *aff'd*, 364 F.2d 829 (5th Cir. 1966))(emphasis omitted). To determine the customary freight unit for a particular shipping contract, we look to the parties' intent "as expressed in the Bill of Lading, applicable tariff, and perhaps elsewhere." *Id.* What constitutes the "customary freight unit" is a question of fact, and

a district court's findings are reviewed for clear error. *Id.; FMC Corp. v. S.S. Marjorie Lykes*, 851 F.2d 78, 80 (2d Cir. 1988).

PMSA and Cradock argue that the district court erred in concluding that the plant was shipped on a lump-sum freight charge. The freight charge, they claim, was not a lump sum, but was based on 4% of the shipped cargo's value. Consequently, they argue, the United States dollar is the customary freight unit. They rely on *Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro*, in which the Second Circuit held that COGSA's limitation of liability would not apply because the parties had based the freight charge on the value of the goods. 775 F.2d 476, 485-86 (2d Cir. 1985), *cert. denied*, 475 U.S. 1099, 106 S. Ct. 1502, 89 L.Ed.2d 903 (1986). The court explained, "Having paid a freight charge based on the value of the goods, Allied could reasonably have expected to recover their value if they were lost." *Id.* at 486. The district court in this case rejected the application of *Allied Chemical* not because it disagreed with its reasoning, but rather because it concluded as a factual matter that the freight charge was made on a lump-sum basis, rather than on a value-of-goods basis.

Decisions from other circuits support the conclusion that, if the freight charge was a lump sum, the entire shipment was the customary freight unit. *See Henley Drilling Co. v. McGee*, 36 F.3d 143, 150 (1st Cir. 1994); *General Motors Corp. v. Moore-McCormack Lines*, 451 F.2d 24, 26 (2d Cir. 1971); *Ulrich Ammann Bldg. Equip. Ltd. v. M/V Monsun*, 609 F. Supp. 87, 91 (S.D. N.Y. 1985); *General*

*Motors Corp. v. S/S Mormacoak*, 327 F. Supp. 666, 669 (S.D. N.Y.), *aff'd*, 451 F.2d 24 (2d Cir. 1971) (holding that an entire power plant was the customary freight unit), *cited with approval in Croft & Scully*, 664 F.2d at 1281.

In *Henley Drilling Co. v. McGee*, the First Circuit upheld a summary judgment that a "huge drilling rig" was the customary freight unit because the owner had paid a lump sum to ship it. The court relied on the bill of lading and also on deposition testimony indicating that the charge was based on the projected cost to the carrier. Finding "no competent evidence that the freight charge was based on anything other than a lump sum," the court held that the "drilling rig itself" was the customary freight unit. *Henley*, 36 F.3d at 150 (citations omitted). Thus, even though McGee lost Henley's drilling rig, valued at $629,000, it was liable for only $500. *Id.* at 144, 150; *see also Moore-McCormack Lines*, 451 F.2d at 25 (holding that a power plant shipped by GM was the customary freight unit because GM had paid a lump-sum freight charge for the shipment of the entire plant and the cargo was described as a single unit on the bill of lading). PMSA and Cradock do not challenge the soundness of these decisions, only their applicability to the facts of this case. They maintain that the district court clearly erred in finding that the plant was shipped on a lump-sum basis.

We conclude that the district court's finding that the plant was shipped on a lump-sum basis was not clearly erroneous. We first look to the bills of lading under which the plant was

shipped. Each bill lists certain components of the plant and then states a lump-sum freight charge at the bottom. Unlike the bills of lading in *Allied Chemical*, the bills of lading in this case do not reflect the value of the goods shipped, nor do they give any other indication that the freight charge was based on the value of the goods.[19] Similarly, the initial letter agreement between PMSA and Cradock states that the "total charge" for shipping the plant is $80,000, and does not show that the charge was based on the goods' value. Although the charge may have constituted 4% of the value of the cargo,[20] the relevant documents do not demonstrate that the freight charge was *based on* a percentage of the cargo's value. The freight charge, however calculated, will always be some percentage of the cargo's value. On this record, we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L.Ed. 746 (1948). Accordingly, we affirm the district court's finding that the cargo was shipped on a lump-sum basis and its implied finding that the entire shipment was the customary freight unit.

---

[19] Although the bills of lading show the weight of the cargo, there is no indication that the freight charge was calculated based on the weight of the cargo nor do Cradock and PMSA raise an argument that kilograms are the customary freight unit.

[20] One of the bills of lading in fact contains a freight charge that when divided into value of the goods (culled from the invoices for the purchase of the plant's components) is 2% rather than 4% of the value of the goods. Cabada testified that this must have been a mistake.

34

We recognize that the application of the limitation-of-coverage clause in this case is striking: Cradock would have been indemnified under the policy for only $250, when its lack of due diligence caused the loss of a $1.7 million fish meal processing plant. A district court once commented that it would find that a tractor was a customary freight unit "regardless of the harshness or seeming illogic of such a result." *Caterpillar Americas,* 231 F. Supp. at 650. Here, however, the harshness may be more apparent than real. Cradock's liability to PMSA may be limited as drastically as Cradock's coverage is limited. Although Wilson forfeited the right to rely on the Hague Rules' limitation-of-liability provision in this suit, Cradock may yet be able to invoke that limitation as a defense in the lawsuit filed against it by PMSA in Peru. The unfortunate fact that PMSA may not be made whole is a result of its own failure to obtain first-party cargo insurance; under the unappealed findings of the district court, PMSA's lack of first-party insurance is not attributable to Wilson.

For the foregoing reasons, the judgment of the district court is AFFIRMED as modified, the damage award is VACATED, and the cause is REMANDED for the district court to make comparative negligence findings and to render a judgment not inconsistent with this opinion.