**AMERICAN HOME ASSURANCE COMPANY, Petitioner,**

v.

**FORE RIVER DOCK & DREDGE, INC., C.B. Marine Corporation, and Roger A. Hale, Respondents.**

No. CIV.A.03–10318–WGY.

United States District Court, D. Massachusetts.

June 14, 2004.

Robert J. Murphy, Holbrook & Murphy, Boston, MA, for American Home Assurance Co., Plaintiff.

Jennifer A. Archer, Kelly, Remmel & Zimmerman, Portland, ME, for Fore River Dock & Dredge, Inc., Defendant.

Mark G. Furey, Thompson, McNaboe, Ashley & Bull, Portland, ME, for C.B. Marine Corporation, Defendant.

U. Charles Remmel, III, Kelly, Remmel & Zimmerman, Portland, ME, for Fore River Dock & Dredge, Inc., Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

This case stems from the December 11, 2002 grounding of the Tugboat SEAWIND II ("Tugboat") and its Barge DS64 ("Barge") on Plum Island in Newbury, Massachusetts. On February 19, 2003, the Petitioner, American Home Assurance Company ("American Home"), brought an action against the Respondents, Fore River Dock & Dredge, Inc. ("Fore River"), C.B. Marine Corp. ("C.B.Marine"), and Roger A. Hale ("Hale"), for a declaratory judgment to determine whether certain costs and expenses of, incidental to, or arising from the grounding of the Tugboat and the wreck of the Barge fall within the coverage of a contract of marine insurance, Policy No. B208102, which identifies the Respondents as named assureds. Pet. [Doc. No. 1], at 2–3. Specifically, American Home petitioned this Court to declare that the Respondents' claims with regard to the Tugboat, the damage to the Barge and its equipment, and wreck removal expenses fall within the exceptions to coverage contained in the insurance policy. *Id.* at 9. American Home further petitioned this Court to declare that it is entitled to the value of the salvage removed from the wreck. *Id.* at 10. On March 31, 2003, C.B. Marine filed its answer and Fore River filed a separate answer and counterclaims for declaratory judgment (Count I),

unfair and deceptive acts or practices under Mass. Gen. Laws ch. 93A (Count II), and breach of contract (Count III).[1] C.B. Marine's Answer [Doc. No. 7]; Fore River's Answer [Doc. No. 6]. American Home filed its reply to Fore River's counterclaim on May 12, 2003. Pet'r's Reply [Doc. No. 12].

On February 23, 2004, Fore River moved for partial summary judgment. [Doc. No. 20]; *see also* Fore River's Mem. [Doc. No. 21]. American Home filed its opposition and cross motion for summary judgment on March 18, 2004. Pet'r's Opp'n & Cross Mot. for Summ. J. [Doc. No. 26]; *see also* Pet'r's Mem. [Doc. No. 27]. Fore River filed its reply on March 30, 2004, and C.B. Marine filed its opposition to American Home's cross motion on March 31, 2004, adopting the same arguments set forth by Fore River. Fore River's Reply [Doc. No. 30]; C.B. Marine's Opp'n [Doc. No. 35]. These motions are now before the Court.

## II. BACKGROUND

The following recitation of facts is taken from both Fore River's and American Home's affidavits and statements of facts pursuant to Local Rule 56.1. D. Mass. Local R. 56.1.

### A. The Parties

Petitioner American Home is an insurance company with its principal place of business in New York, New York, and a license to do business within the Commonwealth of Massachusetts. Pet. at 1. Respondents Fore River, a maritime dredging and construction company, and C.B. Marine have their principal places of business in Portland, Maine. *Id.* at 2. Respon-

---

1. The parties have since dismissed by stipulation Count III of Fore River's counterclaim.

Stipulation of Dismissal [Doc. No. 36].

dent Roger A. Hale is the owner and President of Fore River. Fore River's Facts [Doc. No. 22], Ex. A [hereinafter "Hale Aff."] ¶ 1. Hale was formally the owner and President of C.B. Marine as well until he sold the company in 1999 to General Marine, a company owned by his father, Roger P. Hale. Fore River's Reply, Ex. A [hereinafter "2d Hale Aff."] ¶ 2.

## B. The Lease Agreement Between C.B. Marine and Fore River

The Tugboat and Barge at issue in this case, including a Lima crane, equipment, and tools on the deck of the Barge, were owned by C.B. Marine and leased to Fore River under a Master Equipment Lease Agreement entered into on July 30, 1997, by Roger A. Hale, who at that time was owner and President of both Fore River and C.B. Marine. Fore River's Facts ¶ 4; Hale Aff., Ex. 1 [hereinafter "Master Lease"], at 6; see also Pet'r's Facts [Doc. No. 29] ¶¶ 5–8. Fore River operates its business entirely with leased vessels, tools, and equipment. Fore River's Facts ¶ 4; Pet'r's Facts ¶ 7.

## C. The Protection and Indemnity Policy

Fore River, C.B. Marine, and Roger A. Hale are all identified as "Named Assureds" on an American Home Protection and Indemnity insurance policy, No. B208102, which provides coverage from May 1, 2002 to May 1, 2003.[2] Hale Aff., Ex. 3 [hereinafter "Policy"]. Eight vessels owned by C.B. Marine and leased to Fore River, including the Tugboat and Barge, are listed in the "Schedule of Vessels" and covered under the Policy. Policy at 1. The Policy also provides: "*WARRANTED:* 1) Not exceeding three (3) crew at risk at any one time." *Id.* at 2.

The Policy's Protection and Indemnity Clauses contain the following coverage provisions:

In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured … such sums as the assured, as owner of the *As Per Schedule of Vessels* shall have become legally liable to pay and shall have paid on account of:

Loss of life of, or injury to, or illness of, any person;

Hospital, medical, or other expenses necessarily and reasonably incurred in respect of loss of life of, injury to, or illness of any member of the crew of the vessel named herein;

Loss of, or damage to, or expense in connection with any fixed or movable object or property of whatever nature;

Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured;

Fines and penalties, including expenses reasonably incurred in attempting to obtain the remission or mitigation of same, for the violation of any of the laws of the United States, or any state thereof, or of any foreign country; provided, however, that this Company shall not be liable to indemnify the assured against any such fine or penalties resulting directly or indirectly from the failure, neglect, or default of the assured or his managing officers or managing agents to exer-

---

2. The Tugboat and Barge are not insured under a hull insurance policy.

cise the highest degree of diligence to prevent violation of any such laws; Costs and expenses, incurred with this Company's approval, of investigating and/or defending any claim or suit against the assured arising out of a liability or an alleged liability of the assured covered by this policy.

Policy at 3. Under these Clauses, however, the insurer "will *not* pay for:"

Loss of, or damaged sustained by the vessel named herein or her tackle, apparel, furniture, boats, fittings, equipment, stores, fuel, provisions or appurtenances;

. . . . .

Any loss, damage, expense or claim collectible under the *Taylor Hull [Clauses] (SP–39C)* form of policy, whether or not the vessel named herein is actually covered by insurance and regardless of the amount thereof.

Policy at 3–4 (emphasis added).

Notwithstanding the Protection and Indemnity Clauses, the Collision and Tower's Liability portion of the Policy extends the following coverage:

[I]f the vessel shall come into collision with any other vessel, craft or structure, floating or otherwise (including her tow); or shall strand her tow or shall cause her tow to come into collision with any other vessel, craft or structure, floating or otherwise, or shall cause any other loss or damage to her tow or to the freight thereof or to the property on board, and the Assured, or the Surety, in consequence of the insured vessel being at fault, shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums, we the Underwriters will pay the Assured or the Surety, whichever shall have paid, such proportion of such sum or sums paid as our subscriptions hereto

bear to the insured value of the vessel, provided always that our liability in respect to any one such casualty shall not exceed our proportionate part of the Limit of Liability as set forth herein[.]

Policy at 6. The Collision and Tower's Liability provisions, however, *exclude* coverage for:

loss, damage, or expense to vessel(s) in tow owned (other than vessel(s) bareboat chartered to others), bareboat chartered, managed or operated by the Assured and/or its affiliated and/or subsidiary companies and/or corporations, and to cargo, owned by the Assured and/or its affiliated and/or subsidiary companies and/or corporations, on board vessel(s) in tow of the vessel(s) hereby insured[.]

Policy at 6.

Finally, the Cargo Legal Liability Endorsement extends the Policy's coverage to:

indemnify the Assured for any sum which the Assured, as owner of the Vessel shall have become liable to pay and shall have paid, in respect of any claim for loss, damage or expense in respect of cargo, including baggage and personal effects of passengers, on board the Vessel, carried, to be carried, or which had been carried on board the Vessel SUBJECT ALSO to the Special Limits of Liability hereinafter provided.

Policy at 7. The Endorsement goes on to impose the following *limits* of liability:

A) with respect to cargo, not property of the Assured, carried by the Vessel, the liability of the Underwriters shall be limited:

(i) to the minimum liabilities and obligations imposed upon the Assured by the U.S. Carriage of Goods by Sea Act, April 16, 1936, regardless of

whether the carriage is subject to the said Act,

. . . . .

B) with respect to cargo, property of the Assured, carried by the Vessel, the liability of the Underwriters shall be limited:

(i) As hereinbefore provided under the preceding clauses A(I) A(ii),

(ii) subject however to reduction by the amount which would be recoverable for the loss under the usual form of All Risks Cargo Policy if fully insured,

(iii) regardless of whether such policy has been obtained[.]

Policy at 8.

### D. The Grounding of the Tugboat and Barge

On December 11, 2002, the Tugboat took the Barge on tow in the Anasquam River near Gloucester, Massachusetts, for transport to the Merrimac River in Newburyport, Massachusetts. Fore River's Facts ¶ 2. The Barge carried on its deck a Lima crane, equipment, and tools. *Id.* ¶ 3. Although the crane was secured to the deck of the Barge by removable turnbuckles, it had not been removed from the Barge for at least ten years prior to the grounding. Pet'r's Facts ¶ 11. Fore River hired Captain Guy Splettstoesser to operate the Tugboat. Fore River's Facts ¶ 6. Four Fore River employees were also present on the flotilla: three men on the Barge and one man accompanying the Captain on the Tugboat.[3] *Id.* ¶ 5.

While navigating the mouth of the Merrimac River, the Tugboat and Barge ran aground on Plum Island. Fore River's Facts ¶ 7; Pet'r's Facts ¶ 12. When the Tugboat began to beat against the stern of the Barge, the two men on the Tugboat got into the Barge.[4] Fore River's Facts ¶ 8. All five men were helicoptered off by the Coast Guard. *Id.*

The Town of Newbury ordered Fore River to remove the Tugboat and Barge from the beach. *Id.* ¶ 10. Fore River salvaged the Tugboat and had it repaired. *Id.* ¶¶ 7, 11.

American Home hired a contractor to remove the Barge, crane, equipment, and tools. *Id.* ¶ 11; Pet'r's Facts ¶ 14. Under a "No Cure No Pay Removal Agreement," American Home paid the contractor $205,000 for its services. Pet'r's Facts ¶ 14. American Home retained the salvage recovered from the wreck. *Id.;* Fore River's Facts ¶ 11.

Fore River received a demand for $750,000 from C.B. Marine for the loss of the Barge, crane, equipment, and tools. Fore River's Facts ¶ 12. Fore River's subsequent request for coverage of the items on the Barge was denied by American Home. *Id.*

Fore River paid for security services to protect and secure the wreck site from December 13, 2002 to January 3, 2003, at a cost of $10,560. *Id.* ¶ 13. Fore River also incurred expenses of $64,910.89 for wreck stabilization and beach clean up on Plum Island. *Id.* Fore River's request for reim-

---

**3.** American Home disputes the location of the Fore River employees. Pet'r's Disputed Facts [Doc. No. 28] ¶ 12; Pet'r's Facts ¶ 13. Contrary to the testimony of the employees, one Coast Guard report states that all five men were traveling on the Tugboat prior to the grounding. Pet'r's Disputed Facts, Ex. G (U.S. Coast Guard Report) at 2.

**4.** Again, American Home disputes the location of the Fore River employees, pointing to an initial Coast Guard report stating that all five men were on board the Tugboat at the time of the grounding. Pet'r's Disputed Facts ¶ 12; Pet'r's Facts ¶ 13.

bursement of these costs was also denied by American Home. *Id.*

## III. DISCUSSION

In its motion for partial summary judgment, Fore River requests this Court to conclude that:

(1) there is wreck removal coverage, including coverage for the incidental costs of providing security for the stranded vessels and for wreck stabilization, beach clean-up, and debris removal; (2) there is coverage for all non-owned, on-deck cargo, including all non-owned tools, equipment, and the Lima crane; (3) the mobile Lima crane is included within the coverage of the cargo and is not excluded because it had not been part of the Barge for an extended period of time; and (4) that C–B Marine Corporation has a right to recover from Petitioner American Home Assurance company the salvage value of the Barge and/or the equipment, tools, and crane retained by American Home or its agents, on the basis that there are no disputed issues of fact and the Respondent is entitled to Summary Judgment as a matter of law.

Fore River's Mot. at 1–2.

In its opposition and cross motion for summary judgment, American Home stands by its determination that Fore River and C.B. Marine could not recover security expenses, beach clean up expenses, or the cost of the Barge, crane, equipment, and tools under the Policy:

American Home denied the Named Assureds' claims for the physical damage and loss to the scheduled vessels as the Protection and Indemnity Policy does not cover loss or damage sustained to the scheduled property of the Named Assured. Rather, the Protection and Indemnity coverage extends to the Named Assureds' legal liability to third parties. Moreover, loss and damage to the subject vessels is specifically excluded under the policy.

Pet'r's Mem. at 2. More specifically, American Home contends that: (1) Fore River's security and clean-up expenses are not related to wreck removal, but instead constitute the mitigation of damages; (2) Fore River cannot recover under the Policy because it breached the Policy's express warranty that only three crew would be at risk at any one time; (3) the Lima crane and equipment do not qualify as recoverable, non-owned "cargo" under the Policy; (4) C.B. Marine, as a "Named Assured," cannot recover the value of a scheduled vessel; and (5) American Home is entitled to keep the salvage under terms of the Policy. *Id.* at 2, 4–12.

### A. Standard of Review

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the nonmoving party, no genuine issues of material fact remain. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). In making its determination, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.*

The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the non-

moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the non-moving party must "go beyond the pleadings, and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a material issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e) (internal quotation marks omitted)). Cross motions for summary judgment, as presented in this case, do not alter the basic summary judgment standard. *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001); *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996) ("Cross motions for summary judgment neither alter the basic Rule 56 Standard, nor warrant the grant of summary judgment *per se.*").

■ Under Massachusetts law,[5] insurance contracts are to be interpreted by courts as matter of law. *Somerset Sav. Bank v. Chicago Title Ins. Co.,* 420 Mass. 422, 427, 649 N.E.2d 1123 (1995). Absent ambiguity, the terms of an insurance contract are given their plain and ordinary meaning. *Jacobs v. United States Fid. & Guar. Co.,* 417 Mass. 75, 76–77, 627 N.E.2d 463 (1994). "[I]nsurance policies should be construed as a whole 'without according undue emphasis to any particular part over another.'" *Mission Ins. Co. v. U.S. Fire Ins. Co.,* 401 Mass. 492, 497, 517 N.E.2d 463 (1988) (quoting *Woogmaster v. Liverpool & London & Globe Insurance Co.,* 312 Mass. 479, 481, 45 N.E.2d 394 (1942)).

If a contractual term is ambiguous, then consideration of parol evidence is appropriate. *Kobayashi v. Orion Ventures, Inc.,* 42 Mass.App.Ct. 492, 496, 678 N.E.2d 180 (1997). "Extrinsic evidence bearing upon

the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract, may be considered both in the construction of ambiguous contract language and in resolving uncertainties in applying the terms of the written contract to the subject matter." *USM Corp. v. Arthur D. Little Sys., Inc.,* 28 Mass.App. Ct. 108, 116, 546 N.E.2d 888 (1989). Yet even when courts allow parol evidence, "the words themselves remain the most important evidence of intention." *Robert Indus., Inc. v. Spence,* 362 Mass. 751, 755, 291 N.E.2d 407 (1973).

■ In the context of insurance contracts in particular, ambiguities are ordinarily "resolved against the insurer, who drafted the policy, and in favor of the insured." *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.,* 169 F.3d 43, 50 (1st Cir.1999) (citing *Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 700, 555 N.E.2d 576 (1990)); *see also Utica Mut. Ins. Co. v. Weathermark Invs., Inc.,* 292 F.3d 77, 80 (1st Cir.2002); *Greenly v. Mariner Mgmt. Group, Inc.,* 192 F.3d 22, 26 (1st Cir.1999). Therefore, "though the parties may adduce extrinsic evidence of their respective intendments, any residual ambiguity must be resolved against the insurer." *Utica Mutual,* 292 F.3d at 80 (citing *Preferred Mutual Insurance Co. v. Gamache,* 426 Mass. 93, 686 N.E.2d 989 (1997)). "Most importantly . . ., coverage exclusions are to be strictly construed against the insurer." *Id.*

## B. Interpreting the Policy as Matter of Law

■ The first question this Court must resolve in interpreting the scope of cover-

---

**5.** Fore River contends that either Massachusetts or Maine law controls, and that both states apply the same principles of insurance policy interpretation. Fore River's Mem. at 8. American Home does not object.

age under the Policy is how the Court should read the Policy when one of the named assureds claims coverage for losses sustained by another named assured. In other words, should this Court treat Fore River's indemnification claims as if Fore River were the only assured under the Policy, or should this Court limit Fore River's coverage by taking into account the fact that C.B. Marine is also an assured? Fore River argues that even though C.B. Marine is an assured, American Home should treat Fore River's claims for coverage as though Fore River were the only assured. Fore River's Reply at 17. Specifically, Fore River urges this Court to find that the "listing of additional named insureds creates coverage for each of the named parties for their own acts as if each had a policy," and that "[i]t does not limit or defeat claims among them or against the carrier because they are added as additional insureds by the owner of the policy." *Id.*

The Fifth Circuit's decision in *Craddock International Inc., v. W.K.P. Wilson & Son, Inc.,* 116 F.3d 1095 (5th Cir.1997), lends support to Fore River's position. *Craddock* involved a marine protection and indemnity insurance policy similar to the Policy in this case. *Id.* at 1102. Cradock,[6] an assured, asserted coverage under the policy for its liability for the loss of cargo owned by an additional assured, PMSA. *Id.* In construing the policy's cargo legal liability provisions, the Fifth Circuit explained that

> [i]t is important to bear in mind that the issue is not PMSA's coverage under the policy for the loss of its own cargo. Rather the issue is Cradock's third-party coverage under the policy for its liability to PMSA for the loss of PMSA's cargo. That PMSA, as an additional

assured, is not insured *directly* under the policy for loss of its own cargo does not necessarily mean that the policy does not cover Cradock's third-party liability to PMSA.

*Id.* (emphasis in original). With this background, the court refused to construe the provision "to exclude coverage if the lost or damaged cargo is the property of 'any assured' regardless of which assured is asserting coverage under the policy." *Id.* Instead, the court construed the provision "to exclude coverage if the lost or damaged cargo is the property of the assured asserting coverage under the policy." *Id.*

American Home attempts to distinguish this case from *Craddock* by arguing that C.B. Marine and Hale are both "named assureds" under the Policy, not "additional assureds" like PMSA. The Court finds this distinction unavailing. Regardless of whether the Respondents are "named assureds" or "additional assureds," this Court is persuaded by *Craddock.* Accordingly, this Court will consider Fore River, C.B. Marine and Hale's claims as if each assured had its own separate policy. This construction of the Policy comports with the principle that ambiguities are ordinarily resolved in favor of the insured. *See Ferrara & DiMercurio, Inc.,* 169 F.3d at 50.

█ This initial resolution leads to a second important question. Although it is undisputed that C.B. Marine is the legal owner of the scheduled vessels and Fore River is the lessee pursuant to the Master Lease, who among the named assureds qualifies as the "owner" of the scheduled vessels as that term is used throughout the Policy? The answer to this question is crucial in this case, as many of the key coverage provisions invoked by Fore River

---

**6.** The plaintiff's name was apparently misspelled in the caption of the complaint and the caption on appeal. *Craddock,* 116 F.3d at 1097 n. 1.

and American Home apply to "the assured, as owner of the vessel." For example, the wreck removal clause of the Policy's Protection and Indemnity Clauses provides:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured ... such sums as *the assured, as owner* of the *As Per Schedule of Vessels* shall have become legally liable to pay and shall have paid on account of:
>
> . . . . .
>
>> Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured ...

Policy at 3 (first emphasis added). Similarly, the Policy's Cargo Legal Liability Endorsement extends coverage to:

> indemnify the Assured · for any sum which *the Assured, as owner of the Vessel* shall have become liable to pay and shall have paid, in respect of any claim for loss, damage or expense in respect of cargo, including baggage and personal effects of passengers, on board the Vessel, carried, to be carried, or which had been carried on board the Vessel ....

Policy at 7 (emphasis added).

Fore River emphatically claims not to be the "owner" of the Tugboat or Barge under the Policy. *See, e.g.,* Fore River's Mem. at 14. Despite this position, Fore River has attempted to ride two horses on this issue. It appears from Fore River's memorandum in support of partial summary judgment that Fore River wants to qualify as a vessel "owner" in order to collect wreck removal expenses from American Home under the Protection and Indemnity Clauses, *see id.* at 9–11, but at the same time does not want to be considered a vessel "owner" subject to the liability limitations of the Cargo Legal Liability Endorsement, *id.* at 14. Fore River cannot have it both ways. Such a schizophrenic reading of the term is unreasonable given the absence of any language within the four corners of the Policy to suggest that the phrase "the assured, as owner of the vessel" has a different meaning when used in the Protection and Indemnity Clauses than in the Cargo Legal Liability Endorsement, or in any other portion of the Policy for that matter. If it is Fore River's position that an "owner" under the Policy does not include a lessee, then Fore River should apply its understanding of the term consistently throughout the Policy.

American Home argues that Fore River is the "owner" of the scheduled vessels as that term is understood under the Policy because Fore River "operated the vessels under an irrevocable Master Lease, which holds Fore River responsible for the operation, maintenance and control of the vessels at all times." Pet'r's Mem. at 5. The Policy, according to American Home, should be read to construe the "owner of the insured vessel" to include "all persons having any interest in the vessel and who are insured by name under the policy." *Id.*

This Court must now determine whether, under the Policy, the term "owner" includes a lessee like Fore River. When used in its regular and ordinary sense, a lessee is not an owner. *See Black's Law Dictionary* 914 (7th ed.1999). But here, construing the term "owner" to exclude a lessee renders the Policy illogical. As previously discussed, this Court agrees with Fore River's position that American Home should treat Fore River's claims for cover-

age as though Fore River were the only assured named in the Policy. All of the Policy's coverage provisions (and exclusions), including those special conditions and endorsements attached to and made part of the Policy, are governed by the following language set out on the very first line of the Policy: "In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured . . . such sums as *the assured, as owner* of the *As Per Schedule of Vessels* shall have become legally liable to pay and shall have paid . . . ." Policy at 3 (first emphasis added). It would logically follow that the entire Policy applies only to "owners" of the scheduled vessels. If this Court treats Fore River as the only assured and construes Fore River as a non-"owner" under the Policy, then the Policy would afford Fore River *no* coverage whatsoever. This is an absurd result. Fore River certainly intended to enjoy some amount of coverage when it applied for and paid for this Policy. *See* Fore River's Mem. at 10. American Home urges this Court to rule that an "owner" under the Policy "includes owners, charterers, lien holders, bailees and entities like Fore River who exclusively operate the vessels under a Master Lease." Pet'r's Mem. at 5. This Court instead finds it sufficient to hold that Fore River, a named assured and the exclusive operator the scheduled vessels under the Master Lease, qualifies as an "owner" as that term is understood under the Policy.

With these initial constructions in place, the Court can now move on to the merits of the parties' claims.

## C. Debris Removal, Wreck Stabilization, and Security

Fore River requests this Court to conclude that it can recover from American Home the costs of beach clean up at Plum Island, wreck stabilization, and security for the grounded Tugboat and Barge. Fore River's Mot. at 1. The Policy provides coverage to Fore River for the "[c]osts or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured." Policy at 3. Fore River contends that the costs expended for wreck stabilization, security, and debris removal are "incidental" to the wreck removal ordered by the Town of Newbury, and thus covered by the Policy's wreck removal provision. Fore River's Mem. at 9–11.

■ American Home argues that these expenses are sue and labor costs recoverable under the Taylor Hull Clauses and therefore excluded from coverage under the Policy. *See* Policy at 3–4 (excluding "[a]ny loss, damage, expense or claim collectible under the *Taylor Hull [Clauses] (SP–39C)* form of policy, whether or not the vessel named herein is actually covered by insurance and regardless of the amount thereof"). The Taylor Hull Clauses contain a sue and labor clause, providing:

In case of any loss or misfortune it shall be lawful and necessary for the assured . . . to sue, labor and travel for, in and about the defense, safeguard and recovery of the vessel named herein, or any part thereof, without prejudice to this insurance, to the charges whereof this Company will contribute as hereinafter provided. It has agreed that the acts of the assured or this Company . . . in recovering, saving and preserving the property insured in case of disaster shall not be considered a waiver or an acceptance of an abandonment, nor as affirming or denying any liability under this

policy; but such acts shall be considered done for the benefit of all concerned, and without prejudice to the rights of either party.

Pet'r's Facts, Ex. I (Purdy Aff.), Attach. A [hereinafter "Taylor Hull Clauses"] at 3. This standard sue and labor clause, with origins tracing back to the seventeenth century, is founded on the basic premise that an assured has a legal duty toward the assurer to prevent or to minimize loss. *See Reliance Ins. Co. v. The Escapade,* 280 F.2d 482, 488 n. 11 (5th Cir.1960).

> Since an assured has the duty toward his underwriter to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter will be liable under the policy, the clause undertakes to reimburse the assured for these expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether.

*Id.* at 488. An insurance company must reimburse the assured for sue and labor expenses "even where ... the ship is ultimately declared a total loss." *Quigg Brothers–Schermer, Inc. v. Commercial Union Ins. Co.,* 223 F.3d 997, 1000 (9th Cir.2000) (quoting *Seaboard Shipping Corp. v. Jocharanne Tugboat Corp.,* 461 F.2d 500, 503 (2d Cir.1972)) (internal quotations omitted) (alteration in original).

■ It is the judgment of this Court that debris removal from the wreck site, including the removal of possible pollutants, is part and parcel of wreck removal and thus covered under the Policy. Contrary to American Home's assertions, this conclusion is not disturbed by the Policy's Taylor Hull Clauses exception. The sue and labor clause only provides coverage to the insured for the costs the insured expends in preventing or ameliorating losses which the insurer would be required to pay pursuant to the terms of the hull insurance policy. *See Blasser Bros., Inc. v. N. Pan–Am. Line,* 628 F.2d 376, 386 (5th Cir.1980) ("The purpose of the sue and labor clause is to reimburse the insured for those expenditures which are made primarily for the benefit of the insurer to reduce or eliminate a covered loss."); *Reliance Insurance Co.,* 280 F.2d at 489 ("The obligation [of the underwriter to reimburse the assured for sue and labor expenses] comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable. If the underwriter would not be liable at all ... there would be no contractual obligation to repay sue and labor."); *American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co.,* 282 F. 514, 520 (3d Cir.1922) (same); *Tillery v. Hull & Co.,* 717 F.Supp. 1481, 1486 (M.D.Fl.1988) ("[Where] damages are not covered by the policy, expenses incurred in mitigating them for the benefit of the insurance company are not recoverable under the sue and labor clause."). Under the Taylor Hull Clauses, American Home would be liable for loss of or damage to the insured vessels' hulls, tackle, apparel, engines, boilers, machinery, appurtenances, equipment, stores, boats, and furniture. Taylor Hull Clauses, at 2; *see also Zurich Ins. Co. v. Pateman,* 692 F.Supp. 371, 376 (D.N.J. 1987) ("The purpose of a hull policy is to insure the hull of the vessel and its gear."). In removing debris and pollutants from the beach, Fore River was mitigating and preventing damages to potential third party claimants, such as the Town of Newbury or a passerby injured by the wreckage; Fore River was not mitigating or preventing damage to the vessels them-

selves.[7] Accordingly, the costs expended by Fore River for beach clean up are not recoverable under the Taylor Hull Clauses, and therefore are not subject to the Policy's Taylor Hull Clauses exception.

■ Fore River's wreck stabilization and security measures, on the other hand, might have been undertaken to preserve the vessels' hulls and gear, making the costs recoverable under the sue and labor clause and thus excluded under the Policy. The Ninth Circuit addressed similar issues in *Quigg Brothers–Schermer*. At issue in *Quigg Brothers–Schermer* were two barges insured under a protection and indemnity policy which excluded claims collectible under hull insurance. 223 F.3d at 998–99. After the barges were grounded in a storm, the assureds "acted swiftly to secure, repair and tow the barges back to [their] yard, incurring a total cost of $53,796.81." *Id.* at 998. The insurance company contended, and the court agreed, that these costs were "clearly collectible under the hull clauses as sue and labor expenses to safeguard and recover the barges." *Id.* at 1000. The court observed that it was "not disputed that the expenses were incurred to safeguard the barges, render them seaworthy, and tow them back to the [assureds'] yard," and emphasized that the assureds "presented no evidence or legal authority to suggest that

the expenses would not qualify as sue and labor . . . ." *Id.* at 1001.

The record in this case shows that, similar to the assureds in *Quigg Brothers–Schermer*, Fore River secured, stabilized, removed, and repaired the Tugboat, Fore River's Facts ¶¶ 7, 11, 13, and secured and stabilized the Barge, *id.* at 13. Also like in *Quigg Brothers–Schermer*, the assureds in this case have not produced any evidence to suggest that the wreck stabilization was undertaken for any reason other than to preserve the vessels, nor have they provided this Court with any legal authority for their position that these expenses would not qualify as sue and labor. This Court holds, therefore, under the guidance of the Ninth Circuit's opinion in *Quigg Brothers–Schermer*, that Fore River's wreck stabilization expenses would be recoverable as sue and labor expenses, which are excluded from the Policy.

Fore River has, however, produced some evidence, albeit scant, suggesting that the security expenses were undertaken, at least in part, to protect the public from the wreck site. The Town of Newbury, in ordering Fore River to remove the Tugboat and Barge from the beach, stated that it was their "opinion that the vessels pose[d] a possible threat to the safety[ ] of the citizens of the Commonwealth of Massachusetts." Hale Aff., Ex.

---

**7.** This reasoning is consistent with the general purposes of the clauses. As stated above, the purpose of the sue and labor clause in a hull policy is to build into the insurance contract an incentive for the assured to protect and to preserve the insured hull after an occurrence in order to minimize the assurer's liability. *See Seaboard Shipping Corp.*, 461 F.2d at 503. The wreck removal clause in a protection and indemnity policy, by contrast, creates no such incentive. The assured could let the wreck deteriorate beyond value and still recover the full cost of wreck removal. *See id.* at 504 ("[C]ompulsory removal" is a term of art in admiralty law and refers to a situation in

which a hull *has been abandoned* by the owner and the hull underwriter but, pursuant to government order, must be removed from navigable waters." (emphasis added)). It is only when the value of the salvage exceeds the cost of removal that the assured has any incentive to protect and to preserve the wrecked vessel, but even then such measures are not required. In the most simple and general terms, the sue and labor clause concerns itself with minimizing loss for the hull insurer, while the wreck removal clause concerns itself with minimizing public hazards as compelled by law. *See id.* at 504–05.

5 (Letter from Conservation Agent Packer to Fore River of 12/12/02). If Fore River's security measures were reasonably necessary to comply with the Town of Newbury's removal order and were not undertaken to safeguard the vessels themselves, then it would be fair to conclude that the security expenses were "incidental to[ ] the removal of the wreck ... when such removal is compulsory by law." Policy at 3; *see also supra* note 7. Roger A. Hale declared in his affidavit that "Fore River paid for 24–hour security services to protect and secure the wreck, *and* to keep the public from the wreck site." Hale Aff. ¶ 13 (emphasis added). Although public safety was a clear concern, Hale's affidavit confirms that Fore River's security measures were also motivated by a desire to protect the vessels themselves. Even placing subjective intent aside,[8] the objective result of these security services was to protect and preserve the Tugboat and Barge, which were both eventually salvaged. Consequently, this Court rules that Fore River's security expenses qualify as sue and labor expenses collectible under the Taylor Hull Clauses and are thus excluded from the Policy.

### D. Crane, Equipment, and Tools

Fore River asseverates that the crane, equipment, and tools that it leased from C.B. Marine and carried on the Barge are covered by the Policy as "cargo" owned by a third party. Fore River's Mem at 11–16. It is beyond dispute that the Policy's Protection and Indemnity Clauses do not cover "[l]oss of, or damaged sustained by the vessel named herein or her tackle, apparel, furniture, boats, fittings, equipment, stores, fuel, provisions or appurtenances." Policy at 4. To overcome this exception, Fore River specifically relies on the coverage provided by the Collision and Tower's Liability clause:

> [I]f the vessel ... shall strand her tow ..., or shall cause any other loss or damage to her tow or to the freight thereof or to the property on board, and the Assured ... in consequence of the insured vessel being at fault, shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums, we the Underwriters will pay the Assured ... such proportion of such sum or sums paid as our subscriptions hereto bear to the insured value of the vessel ....

Policy at 6. The Collision and Tower's Liability endorsement excludes, however, "loss, damage, or expense to vessel(s) in tow owned ..., managed or operated by the Assured ... and to cargo, owned by the Assured ... on board vessel(s) in tow of the vessel(s) hereby insured ...." *Id.* Fore River argues, and this Court agrees, that when taken together, these provisions provide coverage for loss, damage, or expense to cargo owned by someone other than the assured. *See* Fore River's Mem. at 12.

■■■ Assuming for the moment that the crane, equipment, and tools are not owned by Fore River, this Court must address the question whether these items qualify as "cargo" under the Policy. To interpret the meaning of the term "cargo," this Court must first look to the four corners of the contract itself. Nowhere in the Policy is this term defined. Nevertheless, absent ambiguity, this Court should give the term "cargo" its plain and ordinary meaning. *See Jacobs,* 417 Mass. at 76–77, 627 N.E.2d 463. Familiar definitions and common sense indicate that the crane, equipment,

---

8. *See Quigg Brothers–Schermer,* 223 F.3d at 1001 ("Subjective intent does not control the determination of coverage.").

and tools are not cargo. "Cargo ... is '[t]he load or lading of a vessel; the goods, merchandise, or whatever is conveyed in a ship or other merchant vessel. While 'cargo' is primarily the load of the ship, it may have a varying meaning. The term may be applied in such a sense as to include passengers, as well as freight, but in a technical sense it designates goods only.'" *Su v. M/V Southern Aster*, 978 F.2d 462, 469 (9th Cir.1992) (quoting *Black's Law Dictionary* 268 (4th ed.1951) (citations omitted); *see id.* (holding that worthless ballast is not cargo under the Seaman's Wage Act). The American Heritage Dictionary defines cargo as "[t]he freight carried by a ship, airplane, or other vehicle." *American Heritage Dictionary* 241 (2d college ed.1985). The same dictionary defines freight as "[g]oods carried by a vessel or vehicle, esp. goods transported as cargo by a commercial carrier." *Id.* at 533. Under the most generous understanding of the term that common sense will allow, "cargo" is 1) any item, 2) transported on a vessel from one point to another, 3) with only a temporary connection to the vessel.

This understanding of the term "cargo" comports with the language of the Policy as a whole. In contrast to the term "cargo" used in the Collision and Tower's Liability endorsement, the Protection and Indemnity Clauses refer to a vessel's "tackle, apparel, furniture, boats, fittings, equipment, stores, fuel, provisions [and] appurtenances." Policy at 4. A vessel's tackle, apparel, furniture, etc. are items transported from one point to another, but they have much more than a temporary connection to the vessel. These items are not simply hitching a ride on the vessel—rather they are connected to the basic function of the vessel itself. Thus, they cannot reasonably qualify as cargo.

The Cargo Legal Liability Endorsement further supports this understanding of the term "cargo." That endorsement indemnifies the assured for sums paid to satisfy "any claim for loss, damage or expense in respect of cargo, including baggage and personal effects of passengers, on board the Vessel." Policy at 7. For non-owned cargo, the endorsement limits the insurer's liability "to the minimum liabilities and obligations imposed upon the Assured by the U.S. Carriage of Goods by Sea Act ..., regardless of whether the carriage is subject to the said Act." *Id.* at 8. Here, the Policy explicitly includes baggage and personal effects as cargo, and again suggests that cargo includes goods. Baggage, personal effects, and goods are all items, transported on a vessel from one point to another, with only a temporary connection to the vessel.

■ The crane, equipment, and tools at issue here were items transported from one point to another. The more difficult question is whether they had only a temporary connection to the Barge. Although the crane could, in theory, be unsecured and driven off the Barge, it had not actually been removed from the Barge for at least ten years. Pet'r's Facts ¶ 11. It appears from the record that the Barge functioned as an on-site working platform, and that the crane aided the Barge in this basic function. *See* Pet'r's Facts, Ex. E (Appraisal) at 1. The crane thus had more than a temporary connection to the Barge, and therefore cannot reasonably qualify as cargo. As for the equipment and tools, there does not appear to be enough evidence in the record suggesting either way whether these items had a temporary connection to the Barge. Thus it would be inappropriate to award summary judgment to either party on the equipment and tools coverage.

### E. The Barge Salvage

In the event of a collision or grounding, the Protection and Indemnity Clauses suggest that an assured would ordinarily remove the wreck of a scheduled vessel itself and subsequently get reimbursed for the removal costs minus the value of any salvage recovered. *See* Policy at 3 (providing coverage for the "[c]osts or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; provided, however, that there shall be deducted from such claim the value of any salvage recovered from the wreck by the assured"). In this case, American Home removed the wreck of the Barge in the first instance and has retained the salvage.

■ Fore River contends that American Home has no right to the salvaged Barge and should therefore return it to its legal owner, C.B. Marine. This Court can find no trouble with Fore River's position in theory, given that there is nothing within the four corners of the Policy to suggest that American Home has the right to retain the salvaged Barge. Such a result is unsatisfactory as a practical matter, however. Under the wreck removal clause, C.B. Marine would only be entitled to receive the cost expended for wreck removal minus the value of the retained salvage. Since American Home has already paid for wreck removal, giving the entire salvage back to C.B. Marine would constitute a windfall to C.B. Marine under the terms of the Policy. In other words, returning the salvage to C.B. Marine would be the equivalent of reimbursing the assured for the full cost of wreck removal without offsetting the value of the salvage. Therefore, instead of simply ordering American Home to return the Barge salvage, this Court

holds that if the salvage is worth more than the cost of wreck removal, then the balance should go to the assured who claims it, here C.B. Marine.

### F. The Tugboat

American Home petitioned this Court to declare that the Respondents, as named assureds, cannot recover costs and expenses related to the grounding and salvage of the Tugboat, a scheduled vessel. Under the terms of the Policy, it is clear that none of the named assureds can make a claim for damages to the Tugboat. *See* Policy at 3–4 (excluding "[l]oss of, or damaged sustained by the vessel named herein or her tackle, apparel, furniture, boats, fittings, equipment, stores, fuel, provisions or appurtenances"). Consistent with the Court's ruling in Section III.C, *supra*, however, Fore River may recover the "costs and expenses of, or incidental to, the removal of the wreck" of the Tugboat, minus the "value of any salvage recovered from the wreck" of the Tugboat by Fore River. Policy at 3.

### G. The Crew Warranty

American Home argues that its liability under the Policy was discharged because Fore River breached its warranty "[n]ot [to] exceed[ ] three (3) crew at risk at any one time" when it placed four of its employees and a captain on the Tugboat and Barge at the time of the grounding. Pet'r's Mem. at 10. The Policy does not state how a breach of the crew warranty would affect the coverage provisions of the Policy. Fore River contends that the employees on board—a crane operator, a construction foreman, and two laborers—were not crew, but rather passengers riding to the next job site.[9] Fore River's Mem. at

---

9. Fore River further argues that the warranty requires a maximum of three crew per vessel, not a maximum of three crew total. *Id.* at 11. The fact that the premium on the Policy's

10. It is not necessary to resolve the issue of whether the assureds breached this crew warranty. Even if the assureds breached the warranty, they can still recover for the losses outlined in Sections III.C–F, *supra*.

 Under Massachusetts law, "[n]o warranty made ... by the insured ... shall ... defeat or avoid the policy or prevent its attaching unless ... the matter ... made a warranty increased the risk of loss." Mass. Gen. Laws ch. 175, § 186.[10] As matter of law, the risk of loss to American Home under the Policy is greater with five crew at risk than with three crew because the additional crew could bring personal injury claims in the event of a covered occurrence. *See* Policy at 3; *see also Mut. Fire, Marine & Inland Ins. Co. v. Costa*, 789 F.2d 83, 85–86 & n. 1 (1st Cir.1986) (noting in a case involving passengers' personal injury claims that a warranty stating "Max. # of passengers: 100"

could defeat the policy under Mass. Gen. Laws ch. 175, § 186 "[b]ecause a greater number of passengers increases the risk of loss" as matter of law). If this case involved crewmen's claims, then the assureds would most certainly be out of luck in the event of a breach of warranty. As a general matter, claims arising from a risk contemplated by the warranty are not recoverable. *See Costa*, 789 F.2d at 86 n. 1.

 The losses complained of in this case, however, are not related to the crew members at all, but rather to wreck removal and salvage. Under Massachusetts law, a breach of warranty does not defeat or avoid claims that are unrelated to the risk contemplated by the warranty. *See McDonough v. Met. Life Ins. Co.*, 228 Mass. 450, 452–53, 117 N.E. 836 (1917); *see also Drake Fishing, Inc. v. Clarendon Am. Ins. Co.*, 136 F.3d 851, 852–853 (1st Cir.1998) (noting that where certain defects were "irrelevant to the loss[,] ...

---

"Schedule of Vessels" calculates "3 Crew @ $3,350 ea." suggests to this Court that the warranty was intended to limit Fore River to three crew total. Policy at 1. The Court need not resolve this issue, however.

**10.** The Massachusetts Supreme Judicial Court has held that Mass. Gen. Laws ch. 175, § 186 does not apply to "conditions precedent included expressly within the terms of a policy." *Charles, Henry & Crowley, Co. v. Home Ins. Co.*, 349 Mass. 723, 725, 212 N.E.2d 240 (1965); *see also Drake Fishing, Inc. v. Clarendon American Ins. Co.*, 136 F.3d 851, 853 (1st Cir.1998).

[A] statement made in an application for a policy of insurance may become a condition of the policy rather than remain a warranty or representation if: (1) the statement made by the insured relates essentially to the insurer's intelligent decision to issue the policy; and (2) the statement is made a condition precedent to recovery under the policy, either by using the precise words 'condition precedent' or their equivalent.

*Charles, Henry & Crowley*, 349 Mass. at 726, 212 N.E.2d 240. Although this Court has no

difficulty concluding that the number of crew at risk "relates essentially" to American Home's "intelligent decision" to enter the Policy, the terms of the Policy do not meet the second requirement. The phrase "condition precedent" is never used in the Policy. The top page of the Policy states, in relevant part, that "THIS POLICY IS MADE AND ACCEPTED SUBJECT TO the conditions which are hereby specifically referred to and made part of this Policy." Policy at i. This provision does not refer to "warranties." Furthermore, "conditions" are specifically differentiated from "warranties" in the first two pages of the Policy. *Compare id.* at 1 ("*CONDITIONS:* SP–38 Protection & Indemnity Form[,] AI Collision and Tower's Liability Endorsement[,] AIMU Cargo Legal Liability Endorsement # 23A (6/2/83)[,] AI Pollution BuyBack "A"[,] Boom Clause[,] Spoils Clause[, and] Inclusion of Additional Assureds/Loss Payees Endorsement"), *with id.* at 2 ("*WARRANTED:* 1) Not exceeding three (3) crew at risk at any one time[, and] 2) No release to towers"). Given these terms, this Court concludes that the crew warranty is not a condition precedent to coverage. Therefore, Mass. Gen. Laws ch. 175, § 186 applies.

Mass.G.L. ch. 175, § 186 might have precluded either of these defects, or a number of other minor ones, from giving rise to a successful misrepresentation or breach of warranty defense on the policy"). To permit a breach of the crew warranty to defeat or avoid coverage of wreck removal and salvage costs would frustrate Massachusetts' warranty statute. It would essentially allow American Home to defeat the assureds' wreck removal and salvage claims with a warranty which, under these circumstances, does not increase the risk of loss. Although the question whether the breach of warranty increased the risk of loss is usually one of fact, the burden of proof rests with the insurer, *see Pahigian v. Mfrs.' Life Ins. Co.*, 349 Mass. 78, 85, 206 N.E.2d 660 (1965), and here American Home has not provided this Court with any evidence that the breach of the crew warranty increased their risk of wreck removal and salvage losses. Therefore, this Court holds that the assureds can recover wreck removal and salvage costs as provided in Sections III.C–F, *supra*.[11]

## IV. CONCLUSION

Accordingly, consistent with this opinion, Fore River's Motion for Partial Summary Judgment [Doc. No. 20] is ALLOWED IN PART and DENIED IN PART, and American Home's Cross Motion for Summary Judgment [Doc. No. 26] is AL-LOWED IN PART and DENIED IN PART.

SO ORDERED.

11. In making this ruling, this Court is *not* holding that there must be a causal connection between the breach of warranty and the assured's claim, but rather that the claim must generally arise from a risk contemplated by the warranty to be avoidable under Massachusetts law. The difference between the two can be illustrated as follows. Suppose an insured vessel can safely support only four crew members, and the policy warranted that the assured would place no more than four crew members at risk at any one time. One day, the assured places ten crew members on the vessel, and the vessel sinks under the added weight. Under this scenario, any personal injury claims brought by the crew would be a direct result of the breach of warranty. Suppose instead that the vessel does not sink under the added weight, but rather the vessel runs aground after a terrible storm. In this situation, the crew members' personal injury claims would not result from the breach of warranty. But their claims would arise from a risk contemplated by the crew warranty (i.e., that the insurer's potential liability increases with each additional crew member at risk), and therefore would not be recoverable.